IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DANIEL COULBORN HOLLORAN, *et al.,*

     Plaintiffs,

v.                               No. 13-1050

DEPUTY JOE DUNCAN, *et al.*,

     Defendants

---

EVAN BROWN, *et al.,*

     Plaintiffs,

v.                               No. 13-1080

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

DANIEL FISK,

     Plaintiff,

v.                               No. 13-1194

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

AMANDA HALLMAN,

      Plaintiff,

v.                                No. 13-1165

DEPUTY JOE DUNCAN, *et al.,*

      Defendants

---

DALTON HARRIS,

      Plaintiff,

v.                                No. 13-1192

DEPUTY JOE DUNCAN, *et al.,*

      Defendants

---

JAMES C. HOLLORAN,

      Plaintiff,

v.                                No. 13-1187

DEPUTY JOE DUNCAN, *et al.,*

      Defendants

---

ALEXIS PINNELL,

      Plaintiff,

v.                                No. 13-1193

DEPUTY JOE DUNCAN, *et al.,*

      Defendants

---

JOHN RAINEY,

     Plaintiff,

v.                               No. 13-1167

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

AARON RODEN,

     Plaintiff,

v.                               No. 13-1195

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

CODY SCOTT,

     Plaintiff,

v.                               No. 13-1166

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

BLAKE WILLIAMS,

     Plaintiff,

v.                               No. 13-1168

DEPUTY JOE DUNCAN, *et al.,*

     Defendants.

ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT,
GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT OF INDIVIDUAL DEFENDANTS,
GRANTING MOTION OF COUNTY DEFENDANTS FOR
PARTIAL SUMMARY JUDGMENT AND DIRECTING PLAINTIFFS TO
SHOW CAUSE WHY CLAIMS AGAINST JOHN DOE DEFENDANTS
SHOULD NOT BE DISMISSED

*INTRODUCTION*

The Plaintiffs in these consolidated cases, Daniel Coulborn Holloran I ("Holloran Sr."), Daniel Coulborn Holloran II ("Holloran Jr."), Amanda Hallman, Travis Ricke, Evan Brown, Alexis Pinnell, Daniel Fisk, James C. ("Coul") Holloran,[1] Cody Scott, Blake Williams, Dalton Harris, John Rainey and Aaron Roden, have alleged, pursuant to 42 U.S.C. § 1983, that the Defendants, Benton County, Tennessee (the "County") and County Sheriff Tony King (collectively, the "County Defendants"), and Benton County deputies Joe Duncan, Lee Hatley, Jason Lowery, Josh Hedge, Alan Bolan, Mike Lockart, Matthew Fry, Debbie Baird, Brandon Smith, Bryant Allen, Andrew Clem, John Clem, Ricky Mallard, Ricky Pafford, Chris Rogers, Shaun Gary and Bert Wells (collectively, the "Deputy Defendants"),[2] violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs also claim that the Defendants' actions violated the Tennessee Constitution and amounted to trespass; assault and battery; false arrest; false

---

[1]Coul Holloran is Holloran Sr.'s nephew.

[2]The Plaintiffs have also brought suit against certain "John Doe" defendants, identified only as agents, employees and/or law enforcement officers of the County. These Defendants will be addressed separately herein and will not be considered "Deputy Defendants" for purposes of the Court's discussion.

imprisonment; malicious prosecution; conspiracy; negligence; negligent infliction of emotional distress; intentional infliction of emotional distress; negligent hiring/supervision and reckless, wanton and/or deliberately indifferent conduct under state law.  Before the Court are (1) the October 16, 2014 motion of Plaintiffs Hallman, Ricke, Brown, Pinnell, Fisk, Coul Holloran, Scott, Williams, Harris, Rainey and Roden (sometimes referred to as the "Moving Plaintiffs")[3] for partial summary judgment[4] (D.E. 116[5]); (2) the motion of the Deputy Defendants[6] for summary judgment[7] (D.E. 126); and (3) the motion of the County Defendants for partial summary judgment[8] (D.E. 130).

*STANDARD OF REVIEW*

The instant motions have been brought pursuant to Rule 56 of the Federal Rules of Civil

---

[3]Williams's Fourth Amendment claim for unlawful arrest and imprisonment will be addressed separately herein.  As a consequence, he will not be considered a "Moving Plaintiff" for purposes of the Court's analysis of the Fourth Amendment unlawful arrest claims generally.

[4]The Moving Plaintiffs seek summary judgment on the issues of unlawful arrest, municipal liability of the County and the Deputy Defendants' failure to intervene in their arrests.

[5]The Docket Entry numbers referred to herein are of those filed in the lead case, 13-1050.

[6]Hatley, Fry and John Clem have been dismissed.  (*See* D.E. 124.)

[7]The Deputy Defendants' motion for summary judgment is grounded in the doctrine of qualified immunity.  They also seek dismissal of the Plaintiffs' state law claims.  The Court notes that Shaun Gary was not identified in D.E. 126 as a movant.  However, his name was placed on the docket sheet entry as such.  Thus, the Court assumes his omission from the briefs was merely an oversight by his attorney, who represents all of the Deputy Defendants.  The Court will treat Gary as if the motion was filed on his behalf in the same manner as the named movants.

[8]The County Defendants' motion seeks summary judgment on Plaintiffs' claims arising from (1) the entry by King and County deputies onto Holloran Sr.'s property, (2) the initial detention of the Plaintiffs prior to their transport to the County jail; (3) the alleged use of excessive force with respect to Holloran Sr. and Roden; and (4) the detention of Plaintiffs at the County jail.  These Defendants also request dismissal of Williams's federal unlawful arrest/false imprisonment claim, Plaintiffs' supplemental state law claims brought pursuant to the Tennessee Governmental Tort Liability Act and claims under the Tennessee Constitution.

Procedure, which provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the [nonmoving] party." *Wesley v. Campbell*, ___ F.3d ___, 2015 WL 859457, at *12 (6th Cir. Mar. 2, 2015) (internal quotation marks omitted). "The ultimate question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, ___ F. App'x ___, 2015 WL 968278, at *4 (6th Cir. Mar. 5, 2015) (quoting *Anderson*, 477 U.S. at 251-52) (internal quotation marks omitted).

*FACTS*

The following material facts are undisputed for purposes of summary judgment unless otherwise noted. Holloran Sr., who resides in Franklin, Tennessee, owns a farm property in the County consisting of a house, shop, barn and large lake (the "Holloran Property" or the "Property"). On June 22 and 23, 2012, a party took place on the Property, attended by two of Holloran Sr.'s children, both of whom were under the age of twenty-one, and numerous guests.

One of the partiers, Ms. Harbin, locked her keys in her car and a locksmith was summoned. At 8:51 p.m. on June 23, County dispatch received a report, apparently from the locksmith, of potential underage drinking at the Holloran Property. Lockart, who was the senior officer, called other deputies on duty, including Smith, Duncan and Bolan, and asked them to meet him at a nearby

business. He informed them of the call and the officers proceeded to the farm to see what was going on. The deputies pulled up to the driveway entrance to the Holloran Property at approximately 10:00 to 10:30 p.m. behind a sport utility vehicle bearing Kentucky plates that was also entering the Property. The officers had a brief discussion with its occupants after which the vehicle moved on. They also encountered an automobile leaving the Property, determined the occupants had not been drinking and permitted it to leave also. The deputies continued down the driveway until they reached a gate. According to the Defendants, it was unlocked and open, while the Plaintiffs insist it was closed and locked. It is undisputed that, when King arrived at the scene sometime later, the gate was closed and locked. The sheriff removed the gate from its hinges and placed it to the side of the driveway.[9] Holloran Sr. estimated in his deposition that the gate was one-fifth of a mile, or 1,056 feet, from the farmhouse.

Following their entry onto the Holloran Property, the officers parked their vehicles and proceeded on foot. After about thirty yards, they came upon three to four young people gathered around a pick-up truck. Lockart asked where the property owner was, to which one responded by identifying the owner as "Mr. Holloran" and advising that he was at the house. The deputy smelled alcohol on the young man and observed a beer next to his feet. When asked his age, the man replied that he was seventeen. Bolan recalled that, "when we first approached and started talking to [the young people next to the entrance], there was [sic] people that were between the age of [eighteen] and [twenty-one] drinking beer in our presence." (D.E. 127-9 at 3.[10])

---

[9]It appears the gate was closed and locked after the first deputies entered the Property.

[10]Citations to the record herein reflect the page number assigned on the docket rather than the page number on the original document.

Some of the guests fled into the woods upon the officers' arrival. One of those who took flight was Roden. When he was caught, he alleged that he was slammed into a fence and thrown onto a fire ant mound.

Holloran Jr. first became aware of the deputies' presence when someone shouted "five-o!" He stepped forward, announced that he was the owner and asked to see the officer in charge. The young man assisted the deputies in gathering the attendees toward the porch area of the residence. They were divided into groups according to whether they were over or under the age of twenty-one. Those who said they had not been drinking were separated out. Officers collected identification and personal information.

When King arrived on the scene, he shined a flashlight in Holloran Jr.'s face and asked for the keys to the house. The teenager responded that he did not have the keys and that the residence had been locked up all evening. King grabbed him, threw him on the ground face down, put his knee in his back, pulled his arms behind him and instructed Duncan to handcuff him. After Holloran Jr. was handcuffed, King started yelling and struck the young man on the side of the head with the flashlight. Duncan helped the teen up and sat him on the porch, where he remained for a few moments before being taken away in an unmarked patrol car.

At one point, deputies told the young people to "shut up" and that they were going to jail. According to several Plaintiffs who were near the house, the sheriff threatened to "throw a gas bomb" on them if they did not settle down. (D.E. 112-9 at 2, 112-8 at 2.) Some of the Plaintiffs also recalled King stating something to the effect of "[y]ou Franklin[11] kids think you can come into my

_____

[11]Franklin, located in Williamson County, is an affluent suburb of Nashville and home to numerous celebrities, many of whom are country music stars. Benton County is largely rural with an estimated 2014 population of 16,290 according to the United States Census Bureau.

county and drink . . . I'll show you." (D.E. 112-6 at 2; *see also* D.E. 112-5 at 3, 112-2 at 2, 112-3 at 3.) It was Ricke's recollection that King was also upset that someone had locked the driveway gate.

It is undisputed by both the County and Deputy Defendants that King ordered everyone at the party to be arrested. It is also undisputed that no breathalysers were used. Over 100 people were arrested and transported to the jail in the backs of squad cars and in a bus that had been dispatched to the Property. Fisk and Pinnell, both of whom were over twenty-one, averred that, on the way to the jail, Fisk asked the deputy driving the squad car in which they were riding why they had been detained and was told he was "just following orders." (D.E. 112-6 at 2-3.) According to Ricke, a deputy on the bus stated that, "We have to do what the Sheriff tells us to do." (D.E. 112-2 at 3.)

When they arrived at the jail, the Plaintiffs were placed in a fenced area outdoors to await processing. Their belongings were taken from them, and they were fingerprinted and led to holding cells -- one for females and one for males. Two individuals in the cell in which the males were being held urinated and vomited on the floor. Eventually, a deputy opened the cell door, tossed in a mop, and closed the door. Brown averred that, at one point, an officer told the males to "shut up" and, upon receiving a sarcastic retort, threatened to pepper spray the speakers. (D.E. 112-3 at 3.) When the men told him they would sue if he carried through with the threat, the officer replied that it "wouldn't be the first time." (*Id.*) According to the Plaintiffs, the sheriff entered the males' cell around 4:00 a.m. and told them to quiet down or he would "blow a gas bomb in [t]here." (D.E. 112-10 at 3, 112-7 at 4; *see also* D.E. 112-6 at 3, 112-4 at 3, 112-3 at 4.) The Plaintiffs were released later in the morning.

In the early hours of June 24, Holloran Sr., who had previously disengaged from the group

of partygoers, attempted to return to the house.  As he approached the shop, he encountered deputies sitting in a circle, drinking and eating food from the party.  Allen asked who he was and he replied that he was the landowner.  He started to walk toward the house when one of the officers instructed another to "go with him."  Holloran Sr. made it to the house and locked the door behind him.  The deputy ran down the porch toward the shop yelling, "He's trying to get away!  He's trying to get away!"  A number of deputies ran into the house and tackled him.  He too was beaten with a flashlight.  Holloran Sr. was then handcuffed and transported to the County jail in a police cruiser. According to Duncan's deposition testimony, approximately forty-eight persons were charged.

*ASSERTIONS OF THE PARTIES AND ANALYSIS*

<u>Section 1983 Claims.</u>

*The Statute Generally.*

Section 1983 provides a cause of action against any person who subjects "any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights [or] privileges . . . secured by the Constitution and laws[.]"  42 U.S.C. § 1983.  A plaintiff bringing suit under the statute must demonstrate that "he was denied a constitutional right, and that the deprivation was caused by a defendant acting under color of state law."  *Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014).  Only the former -- the existence of a constitutional violation -- has been challenged in this case.

*Liability of the Municipality.*

 "A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person to be subjected to such deprivation."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (some quotation marks omitted).

A plaintiff must establish that "action pursuant to official municipal policy caused their injury." *Id.* (internal quotation marks omitted). "Official municipal policy includes the decisions of a government's lawmakers [and] the acts of its policymaking officials[.]" *Id.* A single decision by a policymaker may give rise to municipal liability "if the official is the one who has the final authority to establish municipal policy with respect to the action ordered." *Arnold v. City of Columbus*, 515 F. App'x 524, 538 (6th Cir.) (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)) (internal quotation marks omitted), *cert. denied*, 134 S. Ct. 532 (2013). "[O]n a single-act theory, a plaintiff must demonstrate that a deliberate choice to follow a course of action is made from among various alternatives by the official responsible for establishing final policy with respect to the subject matter in question." *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (internal quotation marks omitted), *reh'g & reh'g en banc denied* (Dec. 19, 2013). In Tennessee, a county sheriff is a municipal policymaker as to law enforcement decisions. *Spurlock v. Sumner Cnty.*, 42 S.W.3d 75, 82 (Tenn. 2001).

A plaintiff seeking imposition of municipal liability must also establish that the act attributed to the governmental entity caused constitutional harm; that is, that it was the "moving force" behind the constitutional wrong. *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014). "Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). "[P]roof that a municipality's . . . authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Id.* at 405. "Similarly, the conclusion that the action taken or directed by the [municipality's] authorized decisionmaker itself violates federal law

will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.*

It is undisputed that King, the municipal policymaker with respect to law enforcement, made the relevant decisions with respect to law enforcement matters. To the extent King is liable for constitutional violations concerning those matters, so is the County. The Moving Plaintiffs' motion for summary judgment on this issue is GRANTED.

*Qualified Immunity of the Deputy Defendants.*

An individual defendant may be immune from suit under § 1983 under certain circumstances. *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 356 (6th Cir. 2013). Qualified immunity is a defense both to liability and to the suit itself. *Jones v. Sandusky Cnty., Ohio*, 541 F. App'x 653, 660 (6th Cir. 2013). It "seeks to prevent government officials, such as police officers, from being held liable for reasonable mistakes, including mistakes of law, fact, or mixed questions of law and fact." *Id.* The doctrine "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

"A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (per curiam). "A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotation marks omitted). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted). "We need not find a case in which the very action in question has previously been held unlawful, but, in the light of pre-existing law, the unlawfulness must be

apparent." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 684 (6th Cir. 2013) (internal quotation marks omitted). The requirement that a right be clearly established "balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (alteration omitted).

If a defendant asserts qualified immunity, the plaintiff bears the burden of showing that (1) considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) the right was clearly established at the time of the defendant's conduct. *Benison v. Ross*, 765 F.3d 649, 664 (6th Cir. 2014), *reh'g & suggestion for reh'g en banc denied*, 771 F.3d 331 (6th Cir. Nov. 13, 2014). The inquiries may be addressed in any order. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

*Alleged Constitutional Violations.*

At the outset, the Court notes that claims involving searches and seizures, such as those alleged here, should be analyzed under the Fourth Amendment's objective reasonableness standard rather than the rubric of Fourteenth Amendment substantive due process. *Henderson v. Reyda*, 192 F. App'x 392, 395 (6th Cir. 2006). The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . but upon probable cause . . ." U.S. Const., amend. IV. The touchstone of the Fourth Amendment is reasonableness. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014).

<u>Entry onto the Holloran Property</u>

The County and Deputy Defendants assert that the initial entry onto the Holloran Property

by Lockart, Smith, Duncan and Bolan in order to obtain permission from the landowner to investigate the claim of underage drinking constituted a permissible intrusion under Fourth Amendment jurisprudence. In response, the Plaintiffs submit that the presence of a locked gate and "No Trespassing" signs near the driveway prohibited officers from entry onto the Property without a warrant.

The Court finds that summary judgment in favor of the Defendants is appropriate on the claim of illegal entry on the basis of the "open fields" doctrine.[12] In *Oliver v. United States*, 466 U.S. 170 (1984), the United States Supreme Court reiterated its stance, first enunciated in *Hester v. United States*, 265 U.S. 57 (1924), that police officers are permitted to enter and search an open field absent a warrant, even where locked gates and no trespassing signs are present.[13] *Oliver*, 466 U.S. at 173. In *Hester*, Justice Holmes observed that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Hester*, 265 U.S. at 59. The *Oliver* Court found that

> [t]his interpretation of the Fourth Amendment's language is consistent with the understanding of the right to privacy expressed in our Fourth Amendment jurisprudence. Since *Katz v. United States*, 389 U.S. 347 [] (1967), the touchstone

---

[12]Although the County and Deputy Defendants contended in their motions that entry was made pursuant to a permissible "knock and talk" investigation and presented no argument on the open fields doctrine, the Court finds it applicable, and dispositive, of the issue.

[13]The facts in *Oliver* are similar to those presented here. Acting on reports that marijuana was being grown on Oliver's property, narcotics agents went to his farm to investigate. *Oliver*, 466 U.S. at 173. When they arrived, they drove past Oliver's home to a locked gate with a "No Trespassing" sign. *Id.* A footpath led around the gate. *Id.* The officers parked their car, walked around the gate and continued down the road for several hundred yards. *Id.* They eventually found a field of marijuana. *Id.* The officers had no warrant or probable cause to search, and no exception to the warrant requirement applied. *Id.* & n.1.

of Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy. The Amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as "reasonable."

*Oliver*, 466 U.S. at 177 (internal citations & some quotation marks omitted). The Court explained that

open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or "No Trespassing" signs effectively bar the public from viewing open fields in rural areas. . . . [T]he public and police lawfully may survey lands from the air. For these reasons, the asserted expectation of privacy in open fields is not an expectation that society recognizes as reasonable [for Fourth Amendment purposes].

*Id.* at 179 (internal footnotes & some quotation marks omitted); *see also Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) ("The Fourth Amendment does not . . . prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text," citing *Hester*); *United States v. Jones*, 132 S. Ct. 945, 953 (2012) (government's intrusion into open field, even if a trespass at common law, "is of no Fourth Amendment significance," citing *Hester* and *Oliver*). Accordingly, viewing the facts in the light most favorable to the nonmovants, the Court finds that the Plaintiffs have failed to establish that the warrantless entry upon the Holloran Property violated the Fourth Amendment. Summary judgment in favor of Defendants is GRANTED as to Plaintiffs' § 1983 claims arising from such entry.

<u>Detention at the Holloran Property Prior to Transport to the Jail</u>

Under the Fourth Amendment, there are three types of permissible encounters between police

officers and citizens: "consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry*[14] stop which must be predicated upon 'reasonable suspicion['] and arrests which must be based on probable cause." *Aquino v. Honda of Am., Inc.*, 158 F. App'x 667, 672 (6th Cir. 2005) (per curiam) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)). The initial investigatory detentions of the partygoers invoked the second type.

The Fourth Amendment permits brief investigative stops "when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (internal quotation marks omitted). "The reasonable suspicion necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree of reliability." *Id.* (internal quotation marks omitted). "The standard takes into account the totality of the circumstances -- the whole picture." *Id.* (internal quotation marks omitted). "In examining the totality of the circumstances, it is important to note that the officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008).

"Although a mere 'hunch' does not create a reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 134 S. Ct. at 1687 (citations & some internal quotation marks omitted). "Reasonable suspicion depends on the factual and

---

[14]So named for the United States Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968).

practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 1690 (internal quotation marks omitted). A determination of reasonable suspicion is based on a commonsense approach with an eye toward human behavior. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

It is the position of the County and Deputy Defendants in seeking summary judgment that, at the time all of the guests were detained at the front of the house, the officers had reasonable suspicion that the occupants of the Holloran Property were either engaging in underage possession or consumption of alcohol or knowingly allowing underage persons to consume or possess alcohol, both of which are crimes under Tennessee law. Specifically, Tennessee Code Annotated § 1-3-113 makes it "unlawful for any person under twenty-one (21) years of age to . . . possess, transport or consume alcoholic beverages, wine, or beer." Tenn. Code Ann. § 1-3-113(b). Tennessee law also prohibits "any person under the age of twenty-one (21) years to have in such person's possession or to consume any intoxicating liquor or beer for any purpose[.]" Tenn. Code Ann. § 57-3-412(a)(3)(A). Moreover, "[i]t is an offense for any owner, occupant or other person having a lawful right to the exclusive use and enjoyment of property to knowingly allow a person to consume alcoholic beverages, wine or beer on the property; provided, that the owner, occupant or other person knows that, at the time of the offense, the person consuming is an underage adult." Tenn. Code Ann. § 39-15-404(a)(3)(B). Finally, "[a]ny adult who contributes to or encourages the delinquency or unruly behavior of a child, whether by aiding or abetting or encouraging the child in the commission of an act of delinquency or unruly conduct or by participating as a principal with the child in an act of delinquency, unruly conduct or by aiding the child in concealing an act of delinquency or unruly conduct following its commission," commits a misdemeanor. Tenn. Code

Ann. § 37-1-156(a). An adult is defined as "any person eighteen (18) years of age or older" and a child as "[a] person under eighteen (18) years of age." Tenn. Code Ann. § 37-1-102(b)(3)-(4). "'Contribute to' means to have a share in bringing about a result." *State v. Kiestler*, No. W2007-02703-CCA-R3-CD, 2009 WL 152143, at *5 (Tenn. Ct. App. Jan. 20, 2009) (alterations & some internal quotation marks omitted). "Contributing to the delinquency of a minor may be committed in an unlimited variety of ways which tend to produce or encourage or to continue conduct with a child which would amount to delinquent conduct." *Butturini v. Blakney*, No. 3:08-CV-128, 2012 WL 775293, at *6 (E.D. Tenn. Mar. 7, 2012) (quoting *Birdsell v. State*, 330 S.W.2d 1, 5 (Tenn. 1959)) (internal quotation marks omitted).

*Terry* also requires that a stop be "reasonably related in scope to the circumstances which justified the interference in the first place." *See Walters v. Stafford*, 317 F. App'x 479, 485 n.6 (6th Cir. 2009) (quoting *United States v. Perez*, 440 F.3d 363, 369-70 (6th Cir. 2006)). There is no rigid period of time in which a *Terry* stop is considered lawful. *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). To determine whether "a particular detention exceeded the boundaries of a permissible investigative stop, it is appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain" the individual. *Hoover v. Walsh*, 682 F.3d 481, 497-98 (6th Cir. 2012) (internal quotation marks omitted). This inquiry also turns on the totality of the circumstances. *Id.* at 498. Factors to be considered include "the length of the detention, the manner in which it was conducted, and the degree of force used." *Walters*, 317 F. App'x at 485 n.6 (quoting *Smoak v. Hall*, 460 F.3d 768, 780-81 (6th Cir. 2006)). "The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case[.]" *United States v.*

*Noble*, 762 F.3d 509, 519 (6th Cir. 2014) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

Here, the Deputy Defendants and King had a reasonable suspicion, supported by articulable facts, to briefly detain the individuals they encountered to determine whether they were engaged in underage drinking, were adults providing alcohol to minors or were property owners permitting the underage consumption of alcohol. It is undisputed that the officers were dispatched to the Holloran Property to investigate suspicion of underage drinking in violation of Tennessee law. Upon lawfully entering the Property, the Defendants observed several individuals who appeared to be under twenty-one consuming alcohol. Many saw the officers and fled into the woods. *See Wardlow*, 528 U.S. at 124 ("Headlong flight -- wherever it occurs -- is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *Hoover*, 682 F.3d at 495 ("it is clear that frantic flight from officers is [an] evasive act which will arouse an officer's reasonable suspicion"). Thus, the officers were armed with more than a "hunch" that mischief was afoot. *See Vactor v. Jacobs*, No. 3:07cv00072, 2009 WL 783357, at *9 (S.D. Ohio Mar. 24, 2009) (based on the fact that police had been dispatched to address where plaintiff was present to investigate suspicion of underage drinking and, upon entering the property, had observed several individuals who appeared to be underage consuming alcohol, officers possessed more than mere hunch that underage drinking was occurring, which formed reasonable suspicion sufficient to justify detention of plaintiffs).

The Plaintiffs have offered no evidence or caselaw indicating that the actions of the Deputy Defendants and King in rounding up over 100 people dispersed over several acres of rural property, many of whom were attempting to avoid the officers, and observing and interviewing them individually were not reasonably related in scope to the circumstances which justified the

interference in the first instance. Nor have Plaintiffs challenged the amount of time taken to complete the investigation. The officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions in a timely manner, during which time it was necessary to detain the individuals attending the party. The Court finds, therefore, that the initial detention of the partygoers at the Holloran Property was neither excessive in scope nor impermissibly long in duration.[15] Accordingly, there was no violation of the Fourth Amendment. Summary judgment on the Plaintiffs' Fourth Amendment claims with respect to the initial detention is GRANTED in favor of Defendants.

Excessive Force

Plaintiffs Holloran Sr., Holloran Jr. and Roden have alleged excessive force claims under the Fourth Amendment. The sheriff concedes that questions of fact exist as to whether he used excessive force against Holloran Jr., but argues that he was not present during the alleged excessive force against Holloran Sr. and Roden. As the Plaintiffs are in agreement, the County Defendants' motion for summary judgment on the excessive force claims of Holloran Sr. and Roden is GRANTED and the claims against them DISMISSED. The claims of Holloran Jr. against these Defendants will proceed to trial.

The Deputy Defendants aver that those deputies not present when alleged excessive force was suffered by Holloran Sr. and Roden should not be held liable. They submit that Allen, Baird, Bolan, Andrew Clem, Duncan, Hedge, Lockart, Rogers, Smith and Wells were either not on the Property or were not in the farmhouse when Holloran Sr. claims excessive force was used against

---

[15]Based on the Court's finding that the investigative detention did not violate the Fourth Amendment, it need not address the Deputy Defendants' additional assertion that the Plaintiffs failed to adequately identify each Defendant who detained them.

him.  As the Plaintiffs do not take issue with these assertions, the excessive force claims of Holloran Sr. against these Defendants are DISMISSED.

The Plaintiffs further acknowledge that the Deputy Defendants not present when alleged excessive force was used against Roden are not liable for his constitutional injury.  Although he was unable to identify those who used force on him, the parties agree that, for purposes of summary judgment, those involved in Roden's arrest were Rogers, Gary and Wells.  Accordingly, Roden's excessive force claims are DISMISSED as to all the Deputy Defendants except for these three individuals.

Malicious Prosecution

Malicious prosecution allegations under the Fourth Amendment have been asserted by Holloran Sr. and Holloran Jr. (the "Hollorans").  The Deputy Defendants seek dismissal of those claims.  One pursuing relief must make four showings:

> (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was a lack of probable cause for the prosecution; (3) as a consequence of the prosecution, the plaintiff suffered a deprivation of liberty, as understood in Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Halasah v. City of Kirtland, Ohio*, 574 F. App'x 624, 631 (6th Cir. 2014).  "[A] police officer who did not make the decision to prosecute cannot be held liable for malicious prosecution."  *Id.*

The basis for the dispositive motion is that the Hollorans have failed to present any supporting evidence that the elements of the claim have been satisfied.  In their response, the Hollorans contend only that charges of contributing to the delinquency of a minor were dismissed against them but have pointed to no proof that any of the Deputy Defendants "made, influenced, or participated in the decision to prosecute" them on those charges.  As the Hollorans have failed to

establish the elements of a malicious prosecution claim, it is DISMISSED.

## Arrests of the Moving Plaintiffs

The County Defendants have conceded that questions of fact exist as to whether the arrests of the Plaintiffs were constitutional. In their dispositive motion, the Moving Plaintiffs seek summary judgment against the Deputy Defendants on these claims. To prevail on a claim of unlawful arrest, a plaintiff must demonstrate that the officer lacked probable cause to arrest him or her. *Id.* at 629. An arrest without probable cause constitutes an unreasonable seizure violative of the Fourth Amendment. *Ingram v. City of Columbus*, 185 F.3d 579, 592-93 (6th Cir. 1999). "[A] determination of probable cause to arrest depends simply on whether, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed an offense." *Lilly v. City of Erlanger*, ___ F. App'x ___, 2015 WL 294806, at *6 (6th Cir. Jan. 23, 2015) (internal quotation marks & alterations omitted). An officer is permitted under this standard to effect a warrantless arrest "even for a misdemeanor, no matter how minor, so long as he has probable cause to believe that an offense has been committed." *Straub v. Kilgore*, 100 F. App'x 379, 383 (6th Cir. 2004). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Lilly*, 2015 WL 294806, at *6.

"Probable cause to arrest someone is an individualized determination made for each person based on the known facts and circumstances at the time." *Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005). Officers may not "make hasty, unsubstantiated arrests with impunity, nor simply turn

a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305 (6th Cir. 2005) (quoting *Ahlers v. Schebil*, 188 F.3d 365, 371-72 (6th Cir. 1999)) (internal quotation marks omitted).

The Deputy Defendants submit there was probable cause to arrest Holloran Jr., Ricke, Brown, Harris and Scott for being underage and under the influence, Roden for flight[16] and Holloran Sr. for permitting underage drinking on his property. They contend probable cause also existed to arrest the remaining Moving Plaintiffs for contributing to the delinquency of minors. Even if probable cause was lacking, they argue, it was King who made the arrests. As the evidence presented creates a jury question as to the Deputy Defendants' participation in the arrests, this issue is not properly disposed of by summary judgment. The Moving Plaintiffs' dispositive motion is DENIED. Furthermore, the Deputy Defendants are not entitled to summary judgment on qualified immunity grounds because, considering the allegations in the light most favorable to the Plaintiffs, a constitutional violation actionable under § 1983 occurred, which the Deputy Defendants have not contended was not clearly established in 2012.

<u>Failure of the Deputy Defendants to Intervene to Prevent Arrests</u>

The Plaintiffs have alleged that the Deputy Defendants failed to intervene in order to prevent their unconstitutional arrests, to which the Deputy Defendants argue they are entitled to qualified immunity. In order to succeed on a failure to intervene claim, a plaintiff must demonstrate that the officers "(1) observed or had reason to know that [the constitutional harm] would be or was being

---

[16]Tennessee Code Annotated § 39-16-603(a) provides that "it is unlawful for any person to intentionally flee by any means of locomotion from anyone the person knows to be a law enforcement officer if the person . . . [k]nows the officer is attempting to arrest the person[] or [if the person] [h]as been arrested."

used, and (2) had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)) (internal alterations omitted). That is, the Deputy Defendants had to perceive was what going on and have sufficient time to intercede to stop the constitutional violation. *Burgess*, 735 F.3d at 475. Officers cannot be held liable for a failure to intervene if they lacked "a realistic opportunity to intervene and prevent harm." *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (citing *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 507 (6th Cir. 2007)).

With respect to this claim, the Deputy Defendants first posit that a reasonable finder of fact could conclude that, when King made his decision to arrest everyone, it was based on the collective knowledge of all the officers at the scene and supported by probable cause. *See Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989) ("probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest"). Thus, the argument goes, any failure to intervene was merely negligent, rather than intentional.

Not surprisingly, these Defendants offer no citations to the record supportive of their assertion of collective knowledge, as the depositions submitted in connection with their briefs tell a quite different story. Alan Bolan, one of the first to arrive on the Property, testified that he believed probable cause existed to arrest individuals he approached who were underage and drinking beer, but he made no move to arrest them at the time he observed them and could not recall who they were. In Andrew Clem's deposition, he was asked, "So you knew -- you knew that numerous people on the scene were arrested without any basis, correct?" (D.E. 113-3 at 4.) He replied, "Yes, sir." (*Id.*) Josh Hedge testified that he knew nothing about any of the partiers, whether they drank or how

they obtained alcohol. Bert Wells did not see anyone drinking or giving alcohol to others. Shaun Gary recalled seeing underage attendees who were visibly intoxicated and holding cans or cups of beer. He knew, however, that not everyone at the party had been consuming alcohol.

Mike Lockart offered testimony that he lacked probable cause to arrest any of the partygoer Plaintiffs. Joseph Duncan testified that he knew King's order to arrest everyone was improper, but did not protest for fear of retaliation. He also stated that he lacked probable cause to arrest all the attendees, adding that about half of them should never have been taken to jail. Brandon Smith denied personal knowledge that the 119 people arrested and transported to the jail had committed a crime. His reservations about the appropriateness of the arrests rose to the point that, after he arrived back at the station, he did not want to affix his name to warrants for fear of perjuring himself. This difficulty could have been avoided, he recalled, if certain partygoers had been issued citations as he and some of the other officers on the scene had initially agreed to do. That plan was "overridden." (D.E. 127-8 at 2.) Smith testified that, based on his training, arresting everyone was improper and unconstitutional. The following testimony was also adduced in his deposition:

> Q: And following the training you have on the Constitutional rights of people, they should not have been brought to jail, unless those determinations were made on the person.
>
> A: Well, you know, that -- that was -- that was above my pay grade. That -- that wasn't my decision to be made, but, yes.
>
> Q: Well, no. Well, if the sheriff says go plant drugs in my ex-wife's car --
>
> A: That's not going to happen.
>
> Q: It's not going to happen.
>
> A: No.
>
> Q: Okay. Now, that's -- that's a much more extreme example of getting an

> unlawful -- unlawful order.

A:      Correct.

Q:      But it doesn't matter that it's a minor Constitution violation, correct?

A:      Correct.  A violation is a violation.

(D.E. 127-8 at 11-12.)  There is no evidence before the Court of "collective knowledge" of officers at the scene of probable cause to arrest all the Plaintiffs.

The Deputy Defendants also insist that they did in fact intervene by questioning the existence of probable cause *after* the arrests were made and the Plaintiffs were transported to the stationhouse. This argument falls flat as well.  While the officers are to be commended for not allowing a bad situation to get worse, by that time the constitutional harm -- the unlawful arrests -- had already occurred.  It reminds the Court of the old idiom about closing the barn door after the horse has bolted.  In any case, the Deputy Defendants have cited to no caselaw holding that an attempt to intervene totally removed in time from the constitutional violation absolves a police officer of liability.

The Court now considers whether a claim for failure to intervene to prevent the Plaintiffs' arrests has been shown.  Even assuming the Deputy Defendants observed or had reason to know constitutional violations were occurring, a question of fact exists as to whether they had a realistic opportunity and means to prevent the harm.

As for whether the right to intervention by officers to prevent unlawful arrest was clearly established in 2012, the Court finds in the affirmative.  The Court agrees with the Deputy Defendants at the outset that these claims generally arise from an alleged used of excessive force. *See Glispy v. Raymond*, No. 06-14269-CIV, 2009 WL 2762636, at *3 (S.D. Fla. Aug. 28, 2009)

(noting that failure to intervene claims generally arise in the context of the use of force).  In determining whether a right is clearly established for purposes of qualified immunity, this Court is to look first to the United States Supreme Court, then to decisions of the Sixth Circuit and other courts therein, and finally to the decisions of other circuits.  *Quigley*, 707 F.3d at 684.

The Deputy Defendants appear to also be correct that the United States Supreme Court has not spoken to the issue of whether failure to intervene extends beyond the excessive force context.  The Sixth Circuit has.  In *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) (per curiam), the appellate court held that

> a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law.  Acts of omission are actionable in this context to the same extent as are acts of commission.

*Ross*, 482 F.2d at 36-37.  It matters not whether the individual violating the constitutional rights of a citizen is a fellow officer or a superior.  *See Smith v. Heath*, 691 F.2d 220, 224-25 (6th Cir. 1982); *Adams v. Selhorst*, 779 F. Supp. 2d 378, 394 (D. Del. 2011).

In *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), the Sixth Circuit relied on *Ross* in holding that an officer could be liable for failing to intervene in an excessive force case.  *Bruner*, 684 F.2d at 426.  That same year, the appellate court concluded in a case alleging illegal search and seizure and unlawful arrest and detention in violation of the Fourth Amendment that "officers who are present at the scene of a violation of another's civil rights and who fail to stop the violation can be liable under [§] 1983[,]" citing *Bruner* and *Ross*.  *See Heath*, 691 F.2d at 225.  Nearly twenty years later, the Sixth Circuit applied *Bruner* to another action involving unlawful seizure.  *See Jacobs v. Village of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001).  In *Jacobs*, the court

observed, referencing *Bruner*, that "officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights." *Id.* The Sixth Circuit went on to cite the Second Circuit's holding in *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994), in which the court found that an officer who fails to intercede is liable for the acts of other officers where he observes or has reason to know "(1) that excessive force is being used; (2) *that a citizen has been unjustifiably arrested*; or (3) that any constitutional violation has been committed by a law enforcement official." *Id.* (citing *Anderson*, 17 F.3d at 557) (emphasis added). At least two district courts in this Circuit have adopted the theory of liability articulated in *Anderson*. *See Carter v. Colerain Twp.*, No. 1:05-CV-163, 2007 WL 869727, at *14 (S.D. Ohio Mar. 20, 2007); *Kaylor v. Rankin*, 356 F. Supp. 2d 839, 850-51 (N.D. Ohio 2005). The latter involved an alleged failure to intervene in an unlawful arrest. *Kaylor*, 356 F. Supp. 2d at 850-51.

Based on the foregoing, as there are questions of fact with respect to the Deputy Defendants' liability for failure to intervene in their arrests, the motion of the Moving Plaintiffs for summary judgment on those claims is DENIED. Moreover, the Deputy Defendants are not entitled to qualified immunity.[17]

<u>Failure of Deputy Defendants to Intervene to Prevent Use of Excessive Force<br>Against Holloran Jr.</u>

The Plaintiffs also contend that the Deputy Defendants failed to intervene to prevent King's assault on Holloran Jr. For purposes of this discussion, the Court will assume that King's actions in taking down the teen constituted excessive force. In his deposition, Holloran Jr. stated that it

---

[17]The Deputy Defendants argue that the circuits are split on this issue, citing decisions from the Eleventh Circuit exhibiting its unwillingness to extend the failure to intervene theory beyond the excessive force context. Of course, cases from the Eleventh Circuit have no precedential value in this Court.

happened very fast and without warning. He recalled that at least one deputy, Duncan, was in the immediate vicinity but he was uncertain as to what the officer was doing when the takedown occurred. When King pulled Holloran Jr.'s arms back, he instructed Duncan to handcuff him, which he did. According to the Plaintiff, King struck him with the flashlight immediately following the handcuffing. After striking the boy, King walked away and Duncan helped him up, retrieved the hat that had fallen from Holloran Jr.'s head, led him to the porch to sit down, and stood next to him.

As noted above, in order for the Deputy Defendants to be held liable for a failure to intervene, "there must be a basis for concluding [(1)] that the [officer/officers] perceived that [King] had embarked on an effort to inflict force upon [Holloran Jr.] . . ., and [(2)] that [he/they] had the means and opportunity to thwart this effort." *Amerson v. Waterford Twp.*, 562 F. App'x 484, 489 (6th Cir. 2014). Moreover, "to avert the harm to [Holloran Jr.], the [officer] would have had to *both* glean the nature of [King's] actions *and* decide upon and implement preventative measures within a short time span[.]" *Id.*

Viewing the evidence in the light most favorable to Holloran Jr., the Court cannot say that Duncan did not have the time and opportunity to intercede to stop the use of excessive force against this Plaintiff. For instance, there is no evidence before the Court that Duncan moved away from King and Holloran Jr. between the time he handcuffed the teen and when he helped him off the ground and to the porch. A reasonable finder of fact could conclude that, if he was close enough to perform both those acts, he was also close enough to at least block the blow from the flashlight, even if the entire event took only seconds. Consequently, the Court DENIES the Deputy Defendants' motion for summary judgment on the basis of qualified immunity for failure to intervene to prevent

excessive force as to Duncan.[18]

Plaintiffs' claims against the remaining Deputy Defendants for failure to intervene must fail, however. They base their claims on evidence that at least some of the officers were aware that King had a certain propensity for violence. Plaintiffs have cited to no caselaw suggesting that mere knowledge of an officer's prior use of excessive force is sufficient to provide his fellow officers with both a reason to know that constitutional harm would be used and the opportunity and the means to stop it in all subsequent circumstances. Here, although the other deputies were present, the Plaintiffs have pointed to no proof that they were close enough to stop a use of force lasting a very short period of time. Nor do they take into account the fact that the other officers were distracted by over 100 teenagers. *See Sheffey*, 564 F. App'x at 793-94 (plaintiff's failure to intervene to prevent excessive force claim without merit where, while defendant officers were present, the use of force occurred quickly and they were distracted).

<u>Plaintiff Williams's Claims for Unlawful Arrest and Imprisonment</u>

The County Defendants seek summary judgment on these claims brought on behalf of Williams on the grounds they are barred by his conviction for underage consumption of alcohol pursuant to a guilty plea. The movants cite to *Heck v. Humphrey*, 512 U.S. 477 (1994), in which the United States Supreme Court held that,

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into

---

[18]Duncan has not asserted that the liability of an officer who failed to intervene to prevent the use of excessive force was not clearly established in 2012. *See Carroll*, 135 S. Ct. at 350 (setting out elements of qualified immunity).

question by a federal court's issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Heck*, 512 U.S. at 486-87 (internal citation & footnote omitted). The Court explained that, when a § 1983 suit is brought, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487. "[I]f the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* (internal footnote omitted). In the Sixth Circuit, "if a plaintiff asserts a claim that contradicts an element of an underlying criminal offense, or if that claim could have been asserted in criminal court as an affirmative defense, *Heck* applies to bar the § 1983 suit." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 609 (6th Cir. 2014).

In response, the Plaintiffs argue that there was no valid conviction and, therefore, *Heck* does not apply. According to the evidence presented, Williams received judicial diversion on a charge of violation of Tennessee Code Annotated § 1-3-113, which, as previously noted herein, prohibits persons under the age of twenty-one from "purchas[ing], possess[ing], transport[ing] or consum[ing] alcoholic beverages, wine, or beer[.]" *See* Tenn. Code Ann. § 1-3-113(b). Plaintiffs submit that, because § 1-3-113 is contained in a chapter of the Tennessee Code entitled "Construction of Statutes," violation thereof is not a criminal offense from which a conviction could arise in accordance with *Heck*. Tellingly, perhaps, Plaintiffs offer no caselaw supporting this assertion.

While the Court was unable to locate any precedent concerning *Heck*'s relationship with the

31

underage alcohol consumption statute, it is clear that the Tennessee courts consider violation of § 1-3-113 to be a crime. *See State v. Kail*, No. W2011-01474-CCA-R3-CD, 2013 WL 2152144, at *9 (Tenn. Crim. App. May 17, 2013) ("In Tennessee, possessing or consuming alcohol while under the age of twenty-one is a crime[,]" citing § 1-3-113), *app. denied* (Sept. 10, 2013); *see also State v. Word*, No. M2011-00082-CCA-R3-PC, 2011 WL 2848709, at *1 (Tenn. Crim. App. July 18, 2011) (appellant sought relief from the Tennessee Court of Criminal Appeals from a conviction and sentence for violation of § 1-3-113); *State v. Dotterweich*, No. E2004-02839-CCA-R3-CD, 2005 WL 1919780, at *1 (Tenn. Crim. App. Aug. 10, 2005) (appellant indicted under § 1-3-113).

The Plaintiffs also insist that the testimony contained in Williams's deposition relative to the guilty plea is unclear and that the judgment entered by the General Sessions Court of Benton County on the matter does not indicate that he pleaded guilty. The following testimony was adduced at the deposition:

Q:      What happened when you went to court?

A:      Well, before we had gone to court, my mom and -- Well, I should say my parents and Ted's parents kind of, like, talked about it and they thought it would be a good idea to obviously get a lawyer and we kind of decided on getting a lawyer, uh, that was in Benton County. I think his last name was Leonard.

Q:      Terry Leonard?

A:      Terry Leonard, yes, sir. And then, of course we had talked to him about the situation and stuff beforehand, we showed up a little early at his office for that. And then later when we went to court and, like, got checked in and stuff, we met up with him. Uh, well, I guess -- I guess what happened really was once we got checked in, we all went in and sat down in not their big courtroom but, like, the smaller one, we sat in there. And then he, you know, called out all the names and we raised our hands showing we were present. And not long after that I believe Mr. Leonard had pulled out myself, Ted, there was a girl that we went to high school with named Erin Mueller who was using, uh, Mr. Leonard as well for that case, and there were two other

people. I'm not sure who they were, they were just random people from the party. So he pulled the five of us out and had talked to us a little bit and said that he had talked with, uh, the judge and that he knew him very well, and he was saying that if we would just, you know admit and, uh -- admit to the drinking that it wouldn't be necessarily like charged with -- I'm sorry, I don't know the exact term -- it wouldn't be, uh, like -- I forget what it's called.

Q:    Let me see if I can help you.

A:    Yeah.

Q:    Did he mention the word diversion? Was that a term you heard him say?

A:    It's so hard to say.

Q:    Did he say that the case would be dismissed and that it wouldn't be on your record? Did he say anything like that?

A:    He said that originally whatever we were gonna get charged with was gonna be more severe than what him and the judge had come to an agreement with, and that if we -- if we admitted to whatever the judge and him had agreed with that all that would come out of it would be like, uh, half a year probation and that we could pay to get it expunged later on. So, I mean, obviously we took that route. And I think that -- Whatever -- I think it was underage consumption and I don't -- I don't know what the term would be for the level above that. But we took the consumption and just, uh, all that was required from us was to seek, like, advising about, uh, alcohol. So Ted and myself, separately, had to meet with this guy and get evaluated. And, I mean, from what I understand, Ted as well, but I know for a fact for only myself that we only had to, like, talk to him two different times, like an hour each, and we just needed to get that on the paper for the court.

Q:    Did you have to ever go back to Benton County court when your probation period was over?

A:    When it was over, uh, from what I understand, it was suppose to become expunged -- Well, the opportunity for it to be expunged was -- that date was January 9th, from what I understand. So we drove down there either on the 9th or like a few days after, my mom and myself, uh, and we were gonna, like, you know, pay the money to get it expunged and off of my record. And when we got there, we had talked with a woman who worked there. I can't say what her position was or if she was, like, a secretary or what exactly what she was, but she kind of told us that, uh -- Once -- Once she had our information and stuff, she said that instead of getting it expunged that day

that we could, like, return home and we would get something in the mail about it, and we never got anything in the mail about it later on that month. And when my mom would try and call them, like contact someone there and leave messages about it, she wouldn't hear back from them. So I think at that point we kind of suspected, like, maybe it was gonna be off of my record like in general or we were -- We kind of didn't really know what to think at that point. Uh, so that's -- that's all I can give on that.

Q:     Do you know whether it has been expunged or not?

A:     Personally, I'm not exactly sure about that.

Q:     Were you contacting the courthouse, the court, or were you contacting the sheriff's department?

A:     It was -- It was the courthouse, I believe.

Q:     Okay. How much did you pay Mr. Leonard?

A:     You know, I'm not really sure exactly about that. My parents and Ted's parents handled all of that. I mean, we never really -- I never really went into detail with my parents about what exactly the price was to use him.

Q:     I'm gonna ask you to check on that and let your attorney know --

A:     Yeah.

                    *       *       *

Q:     Now, when you did appear before the court and you were given a deal, which was a lesser charge than that you were originally charged with, you're not sure what you were originally charged with, but you believe that the deal that was worked out was underage consumption of alcohol, is that --

A:     Yes, sir. That's what I believe.

Q:     And you pled guilty to it?

A:     Yes, sir.

Q:     And you pled guilty to it because in fact you were guilty --

A:     Yes, sir.

Q:      -- of underage consumption.

A:      Yes, sir. . . .

(D.E. 130-2 at 5-9.)

*       *       *

A:      So all five of us stood, I guess, before the judge and were asked by him in that group if we had all, uh, drank or whatever. And I'm pretty sure at that point, either Mr. Leonard said something or -- I mean, none of us had actually spoke. Some of us may have nodded or something of that nature, but I can't really say what that whole encounter was even like, called. So --

Q:      Were you put under oath?

A:      No, sir.

(D.E. 141-12 at 6.)

A copy of the judgment, dated July 11, 2012, was submitted to the Court. In a section thereof entitled "Plea and Waiver of Rights," there were two boxes. One indicated a not guilty plea and the other a plea of guilty to a violation of § 1-3-113. The section was signed by Williams, his counsel and the district attorney even though neither box appeared to have been checked.[19] Although the Plaintiffs do not state in their brief the reason for their assertion that the judgment does not indicate Williams pleaded guilty, the Court assumes the argument rests on the fact that the box for such a plea was not checked. However, the same section also contained the following provision, signed by Judge John W. Whitworth:

I addressed the defendant personally in open court, advised him/her of the rights itemized above, inquired into his/her understanding of the consequences of entering a guilty plea, and inquired into the accuracy of the plea. I hereby conclude that the defendant understands his/her rights, that the plea is voluntary and not the result of

---

[19]The copy of the document submitted to the Court does not bear a checkmark in either box. There is a handwritten word between the two boxes which the Court cannot decipher.

force or threats or of promises apart from a plea agreement, that there is a factual basis for the plea, and that the defendant's willingness to plead guilty results from prior discussion between the District Attorney General and the defendant or the defendant's attorney. Defendant was not under the influence of alcohol, drugs, or mind altering substances.

(D.E. 139-8 at 2.) The judgment reflected that the misdemeanor charge was judicially diverted. Williams was given the opportunity to have his record expunged but there is no evidence that he actually did so.

Even if the box for a guilty plea was not checked, it is clear to the Court that Williams pleaded guilty to the charge of underage drinking. Although he may have been somewhat fuzzy as to some of the details of the proceedings to which he was subjected, he was clear about two things: he pleaded guilty to the charge and he engaged in underage drinking. He was represented by counsel throughout the state proceedings and there is no evidence that he did not have a full and fair opportunity to litigate the issue.

As previously noted herein, a claim of unlawful arrest or imprisonment under federal law "requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Regets v. City of Plymouth*, 568 F. App'x 380, 388 (6th Cir. 2014). Aside from the *Heck* bar, "the existence of probable cause for an arrest totally precludes any [§] 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution." *Watson v. City of Maryville*, 518 F. App'x 390, 392 (6th Cir. 2013). Moreover, "[i]t is clear that under Sixth Circuit precedent, plaintiffs who plead guilty and receive judicial diversion are precluded from pursuing a Fourth Amendment claim for unlawful arrest." *Bolden v. City of Euclid*, No. 1:12 CV 1666, 2013 WL 5935614, at *6-7 (N.D. Ohio Nov. 1, 2013), *aff'd* ___ F. App'x ___, 2014 WL 6871655 (6th Cir. Dec. 8, 2014), *pet. for cert. filed*, No. 14-1103 (Mar. 9, 2015). On appeal, the Sixth Circuit in *Bolden* relied in part on judicial

estoppel to find the plaintiff's Fourth Amendment claim pursuant to § 1983 barred, observing that

> the juvenile court accepted Martin's position that he was trespassing on Officer Doyle's property in order to allow him to participate in the diversion program. He cannot now take a contradictory position to benefit in a civil case. Ultimately, there is no dispute that Martin admitted to the charge in a prior legal proceeding, thereby precluding him from challenging probable cause in this case.

*Bolden*, ___ F. App'x at ___, 2014 WL 6871655, at *4. Likewise, Williams pleaded guilty to underage drinking and received judicial diversion. It appears to the Court that he cannot now claim that he was unlawfully arrested for that crime under the Fourth Amendment. *See Corvin v. Bice*, No. 1:05-CV-219, 2007 WL 776501, at *5 (E.D. Tenn. Mar. 9, 2007) ("Even though plaintiff was given the opportunity to have his record expunged by the state trial judge, he still pled guilty to possession of a controlled substance and is therefore barred from repudiating his guilty plea and relitigating the circumstances surrounding his arrest and the issue of probable cause. Plaintiff's guilty plea, even though it involved judicial diversion, still has the same effect and precludes plaintiff from pursuing a Fourth Amendment claim for unlawful arrest.") Summary judgment is GRANTED to the Defendants on Williams's federal unlawful arrest/false imprisonment claim.

<u>Conditions of Confinement</u>

The County Defendants request summary judgment on Plaintiffs' claims arising from their detention at the County jail. In her complaint, Hallman alleged failure to provide basic necessities during incarceration and denial of medical attention for a condition induced by stress for which she took medication. Pinnell made the same allegations but did not identify any basis for her denial of medical attention claim. Fisk, Harris, Rainey, Scott and Williams claimed cruel and unusual punishment and failure to provide basic necessities. Coul Holloran, a peritoneal kidney dialysis patient with two catheters, alleged that he was placed in a small single cell after he advised jail

officials that his condition made him prone to infection. Shortly thereafter, however, another employee began permitting other males to enter his cell and urinate into the toilet some five feet from the bench where he lay. He also alleged that he missed two doses of his medications. Coul Holloran alleged cruel and unusual punishment, failure to provide for his basic needs and deliberate indifference to his known medical conditions. As noted above, Roden was bitten by numerous fire ants while at the Holloran Property. He averred in his complaint that, when he arrived at the jail, he requested medical treatment for the bites and for injuries to his wrist and was denied. Like Coul Holloran, Roden asserted claims of cruel and unusual punishment, failure to provide for basic needs and denial of medical attention. The Hollorans alleged a "right to medical care" arising from the injuries sustained at the time of their arrests. Various Plaintiffs also claimed that they were not permitted sufficient water, access to toilet facilities or blankets.

Pretrial detainees such as the Plaintiffs have a right not to have jail officials act with deliberate indifference to their serious medical needs, health and safety. *Sours v. Big Sandy Reg'l Jail Auth.*, ___ F. App'x ___, 2014 WL 6871582, at *5 (6th Cir. Dec. 5, 2014). Although these claims were brought pursuant to the Fourteenth Amendment, this Circuit analyzes a pretrial detainee's Fourteenth Amendment substantive due process right utilizing the same test used to determine a convicted prisoner's right under the Eighth Amendment. *Id.*

A claim of deliberate indifference has both a subjective and objective component. *Smith v. Erie Cnty. Sheriff's Dep't*, ___ F. App'x ___, 2015 WL 831730, at *4 (6th Cir. Feb. 26, 2015). The objective component requires a plaintiff to demonstrate a "sufficiently serious medical need." *Id.* In order to establish the subjective requirement, he must show "more than mere negligence, but something less than specific intent to harm or knowledge that harm will result." *Id.*

The County and Deputy Defendants submit that, while some of the Plaintiffs have alleged denial of medical care, they have not presented proof of cognizable injury or serious medical needs requiring treatment during the period they were held at the jail facility. None of the Plaintiffs alleging denial of medical care have offered medical evidence in response to the Defendants' assertions. In addition, many of the Plaintiffs' challenges to the conditions of their confinement grow out of their understandable discomfort in what was likely an alien and frightening environment for most if not all of them. However, as the Sixth Circuit has observed, one "cannot expect the amenities, conveniences and services of a good hotel" at the local lock-up. *Agramonte v. Shartle*, 491 F. App'x 557, 559 (6th Cir. 2012). "Harsh and uncomfortable . . . conditions do not automatically create" a constitutional violation. *Id.* at 560; *see also Griffin v. Southern Health Partners, Inc.*, Civ. Action. No. 1:12CV-P174-M, 2014 WL 6387512, at *7-8 (W.D. Ky. Nov. 14, 2014) (plaintiff's fifty-five hour stay in a detox cell with bugs, foul smells, feces and blood smeared on the floor, vomit in the floor drain, intermittent water, no toilet paper and a thin mat upon which to sleep did not violate the Eighth Amendment). Nor do abusive language and threats of a "gas bomb" give rise to a constitutional violation. *See Cole v. Shelby Cnty.*, No. 12-2117-JDT-cgc, 2013 WL 3432083, at *7 (W.D. Tenn. July 8, 2013) ("The law is clear that verbal harassment and threats do not violate the Eighth Amendment."); *Vanzant v. McQuiggin*, No. 2:10-cv-261, 2011 WL 130333, at *5 (W.D. Mich. Jan. 14, 2011) ("[u]se of harassing or degrading language by a [jail] official, although unprofessional and deplorable, does not rise to constitutional dimensions."). Absent evidence to support either component of deliberate indifference, the Plaintiffs' claims must

fail.[20]

State Law Claims.

### Tennessee Governmental Tort Liability Act.

The County and Deputy Defendants seek dismissal of the Plaintiffs' state law claims pursuant to the Tennessee Governmental Tort Liability Act, Tennessee Code Annotated § 29-20-101, *et seq.* (the "GTLA").[21]   Title 28 U.S.C. § 1367 provides that the federal district courts "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy . . ."  28 U.S.C. § 1367(a).   The district courts may decline supplemental jurisdiction, however, if, "in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c)(4).   The GTLA provides that the circuit courts of Tennessee "shall have exclusive original jurisdiction over any action brought" under the statute.   Tenn. Code Ann. § 29-20-307.   This provision indicates a "clear preference that [GTLA] claims be handled by [Tennessee's] own state courts."  *Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 446 (6th Cir. 2000).   "This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining. jurisdiction." *Id.*   Thus, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' state claims against the Defendants.   *See Hill v. Blount Cnty. Schs.*, No. 3:14-CV-96-PLR-HBG, 2015 WL

---

[20]Indeed, the Plaintiffs' response to the Defendants' motions with respect to these claims was somewhat half-hearted, indicating that, even if there are no independent Eighth Amendment claims, the conditions of confinement at the jail are relevant and admissible to prove damages. Moreover, the Plaintiffs appear to suggest that the fact that King apparently was responsible for the destruction of a videotape from the jail gives rise to a constitutional violation.  It does not.

[21]The GTLA "is a comprehensive scheme which governs tort actions against governmental entities[.]"  *Hill v. Blount Cnty. Schs.*, No. 3:14-CV-96-PLR-HBG, 2015 WL 729547, at *6 (E.D. Tenn. Feb. 19, 2015).

729547, at *6 (E.D. Tenn. Feb. 19, 2015); *Alexander v. Byrd*, No. 14-1022, 2014 WL 5449626, at *9 (W.D. Tenn. Oct. 24, 2014)). These claims are DISMISSED without prejudice.

<u>Tennessee Constitutional Violation.</u>

The County and Deputy Defendants also request dismissal of Plaintiffs' claims under the Tennessee Constitution. The Sixth Circuit and the Tennessee courts have held there is no private right of action for damages under the Tennessee Constitution. *See Douglas v. Gregory*, No. 14-1302-JDT-egb, 2015 WL 507920, at *5 (W.D. Tenn. Feb. 6, 2015) (citing *Cline v. Rogers*, 87 F.3d 176, 179-80 (6th Cir. 1996) & *Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 444-45 (Tenn. Ct. App. 1999)), *app. filed* No. 15-5225 (6th Cir. Mar. 6, 2015). The Plaintiffs' suggestion that this Court ignore those rulings or certify the question to the Tennessee Supreme Court is denied. The state constitutional claims are DISMISSED.

<u>John Doe Defendants.</u>

Rule 4(m) of the Federal Rules of Civil Procedure provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time." As the 120-day period has expired with respect to the John Doe Defendants, the Plaintiffs are DIRECTED to show cause, within eleven days of the entry of this order, why their claims against these Defendants should not be dismissed.

*CONCLUSION*

In sum, the Moving Plaintiffs' motion for partial summary judgment (D.E. 116) is GRANTED IN PART AND DENIED IN PART, as is Deputy Defendants' motion for summary judgment (D.E. 126). The County Defendants' motion for partial summary judgment (D.E. 130) is

GRANTED.  The following claims are DISMISSED:  (1) Plaintiffs' claims of unlawful entry onto and unlawful detention on the Holloran Property; (2) the Fourth Amendment excessive force claims of Holloran Sr. and Roden against the County Defendants; (3) the excessive force claims of Holloran Sr. against the Deputy Defendants; (4) Roden's excessive force claims against all Deputy Defendants except for Rogers, Gary and Wells; (5) the claims of Holloran Sr. and Holloran Jr. for malicious prosecution; (6) Plaintiffs' claims for failure to intervene to prevent the use of excessive force on Holloran Jr. against all Deputy Defendants except for Duncan; (7) Plaintiff Williams's federal claims for unlawful arrest/false imprisonment; (8) Plaintiffs' claims arising from their confinement at the Benton County jail; (9) Plaintiffs' GTLA claims[22]; and (10) Plaintiff's claims under the Tennessee Constitution.  Plaintiffs are DIRECTED to advise the Court with respect to the John Doe Defendants as discussed herein within eleven days of the entry of this order.

IT IS SO ORDERED this 18th day of March 2015.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[22]As noted, the Plaintiffs' GTLA claims are dismissed without prejudice.