IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DANIEL COULBORN HOLLORAN, *et al.,*

    Plaintiffs,

v.                           No. 13-1050

DEPUTY JOE DUNCAN, *et al.*,

    Defendants

---

EVAN BROWN, *et al.,*

    Plaintiffs,

v.                           No. 13-1080

DEPUTY JOE DUNCAN, *et al.,*

    Defendants

---

DANIEL FISK,

    Plaintiff,

v.                           No. 13-1194

DEPUTY JOE DUNCAN, *et al.,*

    Defendants

---

AMANDA HALLMAN,

     Plaintiff,

v.                                  No. 13-1165

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

DALTON HARRIS,

     Plaintiff,

v.                                  No. 13-1192

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

JAMES C. HOLLORAN,

     Plaintiff,

v.                                  No. 13-1187

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

ALEXIS PINNELL,

     Plaintiff,

v.                                  No. 13-1193

DEPUTY JOE DUNCAN, *et al.,*

     Defendants

---

JOHN RAINEY,

      Plaintiff,

v.                                                    No. 13-1167

DEPUTY JOE DUNCAN, *et al.,*

      Defendants

---

AARON RODEN,

      Plaintiff,

v.                                                    No. 13-1195

DEPUTY JOE DUNCAN, *et al.,*

      Defendants

---

CODY SCOTT,

      Plaintiff,

v.                                                    No. 13-1166

DEPUTY JOE DUNCAN, *et al.,*

      Defendants.

---

### ORDER DENYING PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL

---

## I.  INTRODUCTION

On February 17, 2016, a jury returned a verdict for the Defendants in this matter and judgment was entered in their favor.   (Docket Entry ("D.E.") 231, 234.[1])   Before the Court is the

---

[1]All docket entries herein refer to those filed in the lead case -- 13-1050.

timely renewed motion of the Plaintiffs, as supplemented, for judgment as a matter of law ("JMOL") and for a new trial, pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure.[2]  (D.E. 239, 258.)

## II.  BACKGROUND

The instant consolidated lawsuits stem from a keg party that occurred in rural Benton County, Tennessee (the "County"), in the summer of 2012.   After receiving a report of possible underage drinking on a farm owned by Plaintiff Daniel Coulborn Holloran I ("Holloran Sr."), County law enforcement officers converged on the property; rounded up the partygoers, many of whom fled into nearby woods; entered the farmhouse; allegedly beat at least two attendees; arrested over 100 persons, including Holloran Sr., and detained them in the County jail for several hours before releasing them.   The Plaintiffs brought these actions against the County, Benton County Sheriff Tony King and numerous County deputies, alleging violation of their Fourth and Fourteenth Amendment rights under the United States Constitution pursuant to 42 U.S.C. § 1983; violation of the Tennessee Constitution; trespass; assault and battery; false arrest; false imprisonment; malicious prosecution; conspiracy; negligence; negligent infliction of emotional distress; intentional infliction of emotional distress; negligent hiring/supervision; and reckless, wanton and/or deliberately indifferent conduct.   In an order entered March 18, 2015, this Court dismissed Plaintiffs' claims of unlawful entry onto and unlawful detention of Plaintiffs on the property; the Fourth Amendment excessive force claims of Holloran Sr. and Aaron Roden against the County and Sheriff King; the excessive force claims of Holloran Sr. against the County deputies; Roden's excessive force claims against certain deputies; claims of malicious prosecution

---

[2]While this motion has been brought on behalf of Plaintiff Blake Williams, the Court notes that his claims were dismissed in their entirety on January 28, 2016, prior to trial.   (D.E. 203.) Further, because it finds it unnecessary, the Plaintiffs' request for oral argument is denied.

asserted by Holloran Sr. and his son, Daniel Coulborn Holloran II ("Holloran Jr."); claims for failure to intervene to prevent the use of excessive force upon Holloran Jr. against certain deputies; Plaintiffs' claims arising from their confinement at the Benton County jail; and claims under the Tennessee Governmental Tort Liability Act and the Tennessee Constitution. (D.E. 154.) The remaining claims proceeded to trial.

### III.   STANDARD OF REVIEW

To succeed on a motion brought in accordance with either Rule 50 or 59, a movant "must overcome the substantial deference owed a jury verdict." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir.) (quoting *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007)), *reh'g en banc denied* (Aug. 15, 2016). A JMOL may be granted before a case is submitted to the jury under Rule 50(a) "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). If the JMOL is not granted at that time, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). After trial, a party may file a renewed JMOL, along with a request for new trial under Rule 59. *Id.* In ruling on the renewed motion, the court may allow judgment on the jury's verdict, order a new trial or direct the entry of a JMOL. *Id.*

In ruling on such motions, the district court is to "view the evidence in the light most favorable to the [parties] who prevailed at trial, and [it may] grant the motion only if there was no genuine issue of material fact for the jury and reasonable minds could reach only one conclusion -- in favor of the [movant]." *Finn v. Warren Cty., Ky.*, 768 F.3d 441, 450 (6th Cir. 2014), *reh'g en banc denied* (Oct. 30, 2014). The court "may not at this stage make decisions on the credibility of

the witnesses, weigh the evidence, or substitute [its] own judgment for that of the jury." *Id.* Courts are instructed that "[i]f there is any credible evidence to support a verdict, it should not be set aside." *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016), *reh'g en banc denied* (Jan. 4, 2017). Stated differently, "the decision to grant judgment as a matter of law or to take the case away from the jury is appropriate whenever there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." *Allied Waste N. Am., Inc. v. Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC*, No. 3:13-00254, 2016 WL 7157609, at *2 (M.D. Tenn. Dec. 8, 2016) (internal quotation marks omitted).

Under Rule 59,

[a] new trial is warranted when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias.

*Farr v. Village of New Haven*, ___ F. App'x ___, 2016 WL 7238906, at *4 (6th Cir. Dec. 14, 2016) (quoting *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012)) (internal quotation marks omitted). "New trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable." *Cranpark, Inc. v. Rogers Group, Inc.*, 821 F.3d 723, 737 (6th Cir.) (quoting *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 394-95 (6th Cir. 2014)) (internal quotation marks omitted); *reh'g en banc denied* (May 31, 2016); *see also Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 534 (6th Cir. 2014) ("[G]ranting a new trial on [weight of the evidence] ground[s] is a rare occurrence . . . . Therefore, we will uphold the verdict if it was one which the jury reasonably could have reached; we cannot set it aside simply because we think another result is more justified."). That is, "if a reasonable juror

could reach the challenged verdict, a new trial is improper." *Decker*, 770 F.3d at 395 (quoting *Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 821 (6th Cir. 2000)).

Further, a Rule 59 motion "will not be granted unless the moving party suffered prejudice." *Simmons v. Napier*, 626 F. App'x 129, 132 (6th Cir. 2015) (quoting *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004)). "The burden of showing harmful prejudice rests on the party seeking the new trial. To demonstrate prejudice stemming from evidentiary error, it is not sufficient merely to show that the district court made a mistake in admitting or excluding certain evidence." *Id.* (internal citations & quotation marks omitted). "An erroneous evidentiary ruling amounts to reversible error, justifying a new trial, only if it was not harmless; that is, only if it affected the outcome of the trial." *Decker,* 770 F.3d at 391 (quoting *Cummins v. BIC USA, Inc.,* 727 F.3d 506, 510 (6th Cir. 2013)); *see also Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000) ("A reversal based on improper admission of evidence is appropriate only when the admission interferes with substantial justice.").

## IV. ARGUMENTS OF THE PARTIES AND ANALYSIS

The issues raised in the instant motion are as follows[3]:

A.    [The] trial court erred in denying Plaintiffs' oral motion to sever prior to trial;

---

[3]In *Simmons*, the appellant offered seven independent grounds for appeal, prompting the Sixth Circuit to cite to *Fifth Third Mortgage Co. v. Chicago Title Insurance Co.*, 692 F.3d 507, 509 (6th Cir. 2012), in which the court noted, "When a party comes to us with nine grounds for reversing the district court, that usually means there are none." *Simmons*, 626 F. App'x at 132-33. The court also observed that "[l]osers in a trial can go hunting for relief on appeal with a rifle or a shotgun. The rifle is better. . . . The shotgun approach may hit the target with something but it runs the risk of obscuring significant issues by dilution," citing *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 955 (7th Cir. 1996). *Simmons*, 626 F. App'x at 133.

B.      The trial court erred in denying Plaintiffs' motion for judgment as a matter of law on Plaintiffs' claim that the officers unconstitutionally entered Holloran[ Sr.]'s home during his arrest;

C.      The trial court erred in denying Plaintiffs' motion for judgment as a matter of law on Plaintiffs' claim that the officers unconstitutionally entered Holloran[ Sr.]'s home during [a protective] sweep;

D.      The trial court erred when it precluded Plaintiffs[] from questioning officers regarding whether *Miranda* warnings were provided before asking civilians to separate into groups at the Holloran property;

E.      The trial court erred in precluding the Plaintiffs from offering the testimony of Sheriff Kenneth Christopher;

F.      The trial court erred in denying Plaintiffs' requests for jury instructions;

G.      The trial court erred in overruling Plaintiffs' objections to the verdict form and submitted an improper jury verdict form;

H.      A new trial should be granted because the verdict was against the weight of the evidence;

I.      The trial court erred in dismissing Plaintiffs' claims for unlawful entry onto the Holloran property and the detention of persons on the property by order dated March 18, 2015 [].

(D.E. 258 at PageID 6427, 6431, 6449, 6451, 6454, 6457, 6466.)   The Court will consider these claims of error in turn.

## A.   Motion to Sever

During a telephone conference on the last business day prior to trial, the Court communicated to counsel its inclination to bifurcate the Plaintiffs' claims for compensatory and punitive damages in order to avoid prejudice to the Defendants with respect to evidence that might be relevant to punitive damages but not to liability or compensatory damages.  Despite his resistance to the idea at the time, Plaintiffs' counsel asserts in the instant motion that, in light of the Court's statement, he "became extremely concerned about the numerous, separate issues and

individual claims that the jury and the Court would be forced to evaluate during trial and the prejudice that could arise to each individual Plaintiff's claim." (D.E. 258 at PageID 6428.) He then orally moved to sever the cases and continue the trial. Both requests were denied.

The parties jointly moved for consolidation of these cases for purposes of discovery on July 22, 2013. (D.E. 43.) Therein, they agreed that

> [t]he cases to be consolidated involve common questions of fact and law with some variance for those that are claiming use of force violations. Moreover, consolidation will serve to eliminate duplicative discovery, prevent inconsistent rulings, conserve resources of the parties, and promote efficiency and judicial economy.

(*Id.* at PageID 334.) The motion was granted the following day. (D.E. 44.) On October 28, 2013, the parties jointly moved to also consolidate the cases for trial, citing the same bases proffered in support of the previous motion to consolidate for discovery purposes. (D.E. 87.) That motion was also granted. (D.E. 88.) Throughout the intervening three years prior to trial, the Plaintiffs never moved to sever or bifurcate the claims raised in this case, even though the bases for their present assertions with respect to severance existed from the date of consolidation. Nor did Plaintiffs' counsel at any time voice any reservations to the Court regarding the consolidations for which they jointly moved. The fact that they failed to consider the issues pointed out by the Court until the eleventh hour and, in retrospect after having lost the case, now wish they had used a different strategy is not the error of the Court. The motion on this claim of error is denied.

## B and C. Entry into the Holloran Farmhouse

Because these assignments of error are discussed together in the Plaintiffs' brief, the Court will follow suit. At trial, the Court denied the Plaintiffs' motions for JMOL as to entries made by officers into the Holloran farmhouse on two occasions on the night of the party. In their renewed

motion, the Plaintiffs argue that a JMOL is warranted because the entries were unconstitutional and violated clearly established Fourth Amendment law. At the outset, the Court notes that the discussion contained in this section deals only with Holloran Sr., the owner of the residence, and Defendants Jason Lowery, Alan Bolan, Ricky Mallard, Shaun Gary, Bryant Allen, Ricky Pafford, Bert Wells and Mike Lockhart, the deputies who entered the house.

Although it is without question that searches and seizures inside a home absent a warrant are presumptively unreasonable under the Fourth Amendment, in some circumstances, "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless entry is objectively reasonable[.]" *Vangel v. Szopko*, ___ F. App'x ___, 2016 WL 6994227, at *2 (6th Cir. Nov. 30, 2016) (internal quotation marks omitted). The exigent circumstances exception to the warrant requirement permits warrantless searches when an emergency provides insufficient time for police officers to obtain a warrant. *Birchfield v. N. Dakota*, 136 S. Ct. 2160, 2173 (2016); *Gradisher v. City of Akron*, 794 F.3d 574, 583 (6th Cir. 2015) ("Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant."). "Time is an essential factor when an *immediate* threat forms the basis for police claims of exigency." *Carlson v. Fewins*, 801 F.3d 668, 674 (6th Cir. 2015), *cert. denied sub nom. Drzewiecki v. Carlson & Fewins v. Carlson*, 136 S. Ct. 1658 (Apr. 18, 2016). "[E]xigent circumstances terminate when the factors creating the exigency are negated[; i]f the dangers persist or increase, the exigent circumstances also persist." *Id.* (internal citations & quotation marks omitted).

Situations giving rise to exigent circumstances include "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others." *Goodwin v. City of Painesville*, 781 F.3d 314, 330 (6th Cir. 2015). The constitutional standard is one of reasonableness; thus, officers' actions may be protected even

"when, judged with the benefit of hindsight, the officers may have made some mistakes." *City &*
*Cty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (internal quotation marks
omitted).   It is the position of Holloran Sr. that the Defendants presented insufficient evidence to
establish exigent circumstances.

### 1.   The First Intrusion

#### a.   Relevant Evidence Presented at Trial Viewed Most Favorably to the Defendants

Lockhart related in his trial testimony that, upon his arrival at the farm, he started up the
driveway and asked a young man he encountered along the way for the name of the property owner.
He also asked the boy, who smelled of alcohol, for his age.   He responded that he was seventeen.
He was standing next to a vehicle, behind the tire of which sat a beer bottle.   Lockhart recalled that
he observed several attendees who were drinking and appeared to be underage.

Mallard testified that he found a girl, reeking of alcohol, passed out in the back of a pickup
truck.   He woke her up and asked her age, which was fourteen.   Later, he and other officers
escorted a number of partygoers to the County jail on a bus.   After they were unloaded, he was
advised by another officer that Holloran Jr. told him a female juvenile family member remained at
the property.   He caught a ride back to the Holloran home, where officers were still attempting to
round up stragglers.   He shared with them the information concerning the juvenile.   Mallard stated
that, at one point, he was standing near the garage when he saw a female run from the woods to the
residence.   Gary testified that he saw the girl as well.   Mallard walked around the side of the
garage and noticed an open door, which he entered.   While he was in the garage looking for the girl,
who he never found, he came upon a bathroom where a male was passed out on the floor in his own
vomit and urine.   Mallard stated that, at that juncture, he was concerned there might be others in the
home that required aid.

Allen, from his vantage point outside the residence, observed a sneaker through an open crack in a door of the garage that had been closed earlier in the evening. Pafford also testified the door was open at that time. Allen looked inside and discovered the shoe was attached to a male lying under a sink. The deputy went in, with Pafford following, and spoke to the boy but got no response. Allen recalled that he smelled vomit and noticed the young man was covered in urine, perhaps not all his own. He discussed the situation with a superior officer on the scene and it was decided that there was not time to obtain a warrant and that a search was necessary to ensure no other youngsters were inside the house and in need of medical assistance. He estimated that the subsequent sweep of the house lasted sixty to ninety seconds. Although Allen testified in his deposition that the sweep occurred some thirty minutes after the boy was found, he related at trial that it was closer to fifteen.

Lowery recalled walking up on a conversation among other officers concerning the boy found in the bathroom and whether other partygoers might be in the house and in distress. King testified that he attempted, without success, to contact the district attorney while he was on the property to obtain advice concerning the propriety of an emergency aid entry. According to Defendant Chief Deputy Rogers, it would have taken ninety minutes to two hours to obtain a search warrant from a judge in Benton County, which was largely rural and did not permit officers to procure warrants by telephone.

Defendant Andrew Clem offered testimony that he stopped a juvenile female as she ran out of the woods wearing only a bikini bottom. She told him she was going to use the bathroom in the garage. He escorted her to the garage and, afterward, to the porch of the residence where deputies

were attempting to gather the partygoers into groups according to age and inebriation. He later transported several juveniles from the farm to the jail.

b. Analysis Relative to the First Entry

Whether an emergency exists "requires an objective assessment of the circumstances." *Gradisher*, 794 F.3d at 583. "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception, but they must have an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Id.* (quoting *Mich. v. Fisher*, 558 U.S. 45, 47, 49 (2009) (per curiam)) (internal quotation marks omitted). "But by the same token, their decision to enter must be based on more than a hunch or the mere possibility that someone inside needs immediate aid." *Id.* (quoting *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 545 (6th Cir. 2013)) (internal quotation marks omitted). It is reasonable for police to move quickly if delay would make the situation more dangerous. *Sheehan*, 135 S. Ct. at 1775. Actions "should be evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002) (internal quotation marks omitted). As one commentator put it, "the question is whether the officers would have been derelict in their duty had they acted otherwise." 3 Wayne R. LaFave, Search & Seizure § 6.6(a) (5th ed. 2016) (internal quotation marks omitted).

The defense of qualified immunity offers complete protection to government officials sued in their individual capacities[4] from § 1983 liability when they are performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional

---

[4]Holloran Sr. does not argue in the motion before the Court that King or the County should have been held liable for either entry into his residence.

rights of which a reasonable person would have known." *Scozzari v. Miedzianowski*, 597 F. App'x 845, 847 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).   The purpose of the doctrine "is to allow public officers to carry out their duties as they think right, rather than acting out of fear for their own personal fortunes." *Greiner v. City of Champlin*, 27 F.3d 1346, 1351 (8th Cir. 1994).   In order to decide whether qualified immunity exists, "courts engage in a two-step inquiry:   (1) whether the defendant violated a constitutional right, and (2) whether that right was clearly established." *Scozzari*, 597 F. App'x at 847.   Once the defense is raised, it is the burden of the plaintiff to establish that the defendant is not entitled to qualified immunity.   *Gavitt v. Born*, 835 F.3d 623, 641 (6th Cir. 2016).   "The defense provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Estate of Brackens v. Louisville Jefferson Cty. Metro Gov't*, ___ F. App'x ___, 2017 WL 679827, at *3 (6th Cir. Feb. 21, 2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotation marks omitted).   It applies "irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Hermansen v. Thompson*, ___ F. App'x ___, 2017 WL 438225, at *2 (6th Cir. Feb. 1, 2017) (citing *Pearson*, 555 U.S. at 231).   The deputies raised the defense as to both entries into the Holloran home.   The Court declined to grant qualified immunity, finding there were factual disputes to be determined by the jury.

Even if the Court agreed with Holloran Sr. that a constitutional harm occurred, the movants have not shown that the right violated was clearly established in 2012.   With regard to this prong of the qualified immunity defense, "a [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Gradisher*, 794 F.3d at 583 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).   Reasonableness is

governed by the state of the law at the time of the conduct. *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005).

> Whether a right has been clearly established should not be determined at a high level of generality. Courts do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Thus, officials can still be on notice that their conduct violates established law even in novel factual circumstances. The essence of qualified immunity is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways.

*Gradisher*, 794 F.3d at 583 (internal alterations, citations & quotation marks omitted); *see also Scott v. Kent Cty.*, ___ F. App'x ___, 2017 WL 655773, at *3 (6th Cir. Feb. 17, 2017) (The court makes the clearly established inquiry "in light of the specific context of the case, not a broad general proposition."); *Fry v. Robinson*, ___ F. App'x ___, 2017 WL 416974, at *4 (6th Cir. Jan. 31, 2017) ("Such clarity requires that the particular conduct at issue has been established as violative in nature.").

The United States Supreme Court recognized in *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006), that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City,* 547 U.S. at 403. In that case, officers responded to a call of a loud party. *Id.* at 401. Upon arriving at the location, the officers heard shouting inside and observed through the windows and a door an altercation taking place in the kitchen between a juvenile and four adults, one of whom was spitting blood from a blow by the juvenile. *Id.* The Court concluded that "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* at 406.

In 2009, the Court explained that the emergency aid exception "requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Fisher*, 558 U.S. at 47 (internal citation & quotation marks omitted). In *Fisher*, officers responding to a disturbance call came upon a truck in the residence's driveway with its front smashed and observed blood on the hood, clothing inside the vehicle and on the door of the house. *Id.* at 45-46. A man could be seen inside the door, screaming and throwing things. *Id.* at 46. The officers noticed he had a cut on his hand and asked if he needed medical assistance. *Id.* He ignored the question, cursed them, and demanded they get a warrant. *Id.* The Court, based on *Brigham City*, found it was objectively reasonable for the officers to believe that the "projectiles might have a human target (perhaps a spouse or a child)" or that Fisher would injure himself. *Id.* at 48.[5]

Courts in the Sixth Circuit have also addressed the emergency aid exigent circumstance. In *United States v. Johnson*, 22 F.3d 674 (6th Cir. 1994), the court permitted officers' warrantless entry into an apartment to rescue a minor being held there against her will. *Johnson*, 22 F.3d at 679-80. In *Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003), police and paramedics arrived at a home in response to a 911 call to find Thacker bleeding profusely, intoxicated and belligerent. *Thacker*, 328 F.3d at 249. He refused to explain his injury and, behind him, the

---

[5]While Holloran Sr.'s counsel made much at trial of proof that no medical assistance was summoned after the boy was removed from the bathroom, the *Fisher* Court rejected the significance of such evidence, stating that,

> even if the failure to summon medical personnel conclusively established that [the officer] did not subjectively believe, when he entered the house, that Fisher or someone else was seriously injured . . ., the test, as we have said, is not what [the officer] believed, but whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger.

*Fisher*, 558 U.S. at 49 (internal quotation marks omitted).

officers noticed broken glass on the kitchen floor and an indentation in the wall with a liquid stain underneath. *Id.* They entered the residence to assist Thacker and any other injured persons and to determine if it was safe for the paramedics. *Id.* The Sixth Circuit held the warrantless entry "to secure the safety of the police, paramedics, and other people possibly inside the home," was justified under the emergency aid exception based on the "totality of the circumstances, including the 911 emergency call, Thacker's conduct, and the uncertainty of the situation[.]" *Id.* at 254.

In *United States v. Huffman*, 461 F.3d 777 (6th Cir. 2006), police received a 911 call concerning shots fired at a residence next door to the caller. *Huffman*, 461 F.3d at 780. When officers arrived, they saw bullet holes in the front windows, shards of glass on the porch, and, through the windows, bullet marks on the interior walls. *Id.* They observed no blood or other signs that anyone was in the house and injured. *Id.* Finding the door locked, they climbed in through a partially open window. *Id.* Although the officers did not find an injured person, they found Huffman asleep in a chair with a fully loaded assault rifle with a laser scope on the table in front of him. *Id.* He was charged with being a felon in possession of a firearm. *Id.*

The court articulated as follows:

> We recognize that in [*Thacker*,] in which this court has upheld a warrantless search based on an exigent-circumstances theory, the officers had more definitive information that either someone was in possible danger . . . The two dispositive factors consistently found . . ., however -- the potential of injury to the officers or others and the need for swift action, [citing *Brigham City, Johnson* and *Thacker*] -- are found in the present case regardless of the absence of blood or other telltale signs of injury.

*Id.* at 785. The court added that "[t]he warrantless entry, moreover, may not be held unconstitutional simply because the reasonable concerns of the officers were not substantiated

after-the-fact." *Id.*; *see also Holloway*, 290 F.3d at 1340 ("The fact that no victims are found . . . does not render the police action any less lawful.").

A decision from the Tenth Circuit, *Galindo v. Town of Silver City*, 127 F. App'x 459 (10th Cir. 2005), also speaks to the issue at hand. The father of a minor called police to report his belief that his daughter was at the home of his sister-in-law and that she had been drinking. *Galinda*, 127 F. App'x at 462. After receiving no answer at the front door, officers went to the back of the house and observed the patio door was partially open. *Id.* Inside, they saw two unresponsive minors, neither of whom was the daughter of the caller. *Id.* at 462-63. Fearing for the minors' safety and welfare, including alcohol poisoning, the officers entered the house, eventually locating the girl drunk in a closet. *Id.* at 463. The court held the officers were entitled to qualified immunity since, "[u]nder these circumstances, where there was an immediate threat of death or severe physical harm, it was objectively reasonable for [the defendant] to have entered" the home. *Id.* at 466 (internal citation & quotation marks omitted).

In this case, upon reading the cases set forth herein in 2012, a reasonable police officer in the deputies' position would not have understood under the circumstances before them that their entry into the farmhouse to conduct a protective sweep for young people in need of medical assistance violated Holloran Sr.'s Fourth Amendment rights. Viewing the evidence in the light most favorable to the Defendants, the deputies knew the following: a drinking party was in progress on a large farm late at night attended by over 100 underage and college age individuals, there was no apparent supervision of the festivities by the homeowner, there was an unknown number of revelers scattered over the property, and officers had seen one person run to the house and found another passed out in the garage bathroom covered in vomit and urine. What they did not know was how many partiers remained unaccounted for or where they might be located.

Accordingly, the Court finds the deputies were entitled to qualified immunity. The motion for judgment as a matter of law as to the initial entry into the Holloran home is denied.

## 2. The Second Intrusion

### a. Relevant Evidence Presented at Trial Viewed Most Favorably to the Defendants

Officers' second entry into the farmhouse occurred later in the evening, when Holloran Sr. approached officers who had congregated around a shed adjacent to the property's driveway near the residence. Mallard described Plaintiff as clad in shorts and a flowered shirt, intoxicated, and sporting fresh cuts on his arms and legs. The property owner advised the deputies that he had just arrived by car, even though Defendant Duncan claimed to have seen him previously on the property, knew he had fled, and instructed officers to arrest him for contributing to the delinquency of minors if he reappeared. Moreover, testimony was adduced that officers sought confirmation from a deputy posted at the front gate, who reported seeing no one arrive or be dropped off. Mallard testified that Holloran Sr. asked if he was going to be arrested and "Allen said, yes, sir, you're going to be arrested." (D.E. 245 at PageID 4594.) Holloran Sr. requested permission to enter the house to get some shoes. Mallard and Gary escorted him to the door of the residence. According to Mallard, Holloran Sr. produced a key from his pocket; unlocked the door; quickly pushed the door open, entered, and slammed it behind him. Mallard stated that the door struck him on the side of his face and knocked him backward. He immediately grabbed the door handle and instructed Holloran Sr. to open the door, which appeared to be locked. He shouted to nearby officers, who entered the house through a side door, took Holloran Sr. to the ground and handcuffed him, despite his attempts to resist.

Allen testified that, when Holloran Sr. approached the deputies and identified himself, he informed the Plaintiff that he believed he would be arrested. He recalled that the property owner responded by saying he needed to check the house and get some shoes. He instructed Mallard and Gary to accompany him, which they did, one on each side. Allen observed Holloran Sr. open the door and slam it hard. Mallard was trying to open the door, yelling that it was locked. Gary ran to a different door. Allen started toward the house, and could see Holloran Sr. inside, running toward the other door in an attempt to lock it before Gary entered. He was too slow. Gary stepped into the residence and took Holloran Sr. to the ground. Other deputies did not hear Allen tell Holloran Sr. he believed he would be arrested, although Gary assumed he was under arrest, even though he had not heard anyone say so, based on Allen's instruction that he be escorted to the house. The deputies corroborated Allen's testimony concerning what occurred during and after Holloran Sr.'s entry into the residence.

### b. Analysis Relative to the Second Entry

At the close of the proof, Holloran Sr., through his counsel, agreed that probable cause existed for his arrest. It is his position in the instant motion that, because he was not under arrest at the time he entered his home, however, the deputies' warrantless entry for the purpose of taking him into custody was unconstitutional. Again, the Court will analyze the issue through the prism of the qualified immunity defense.

In *United States v. Santana*, 427 U.S. 38 (1976), the United States Supreme Court specifically addressed the question of whether one's retreat into his home could thwart an otherwise proper arrest. *Santana*, 427 U.S. at 42. After arresting an individual in an undercover drug purchase, police were informed that the money for the buy could be found at a particular house. *Id.* at 39-40. When officers arrived at the residence, Santana was standing in the doorway with a

brown paper bag in her hand. *Id.* at 40. She retreated into the house and the officers followed, placing her under arrest. *Id.* The Court found the case involved a hot pursuit permitted under the Fourth Amendment. *Id.* at 42-43. In doing so, the Court noted that, while "hot pursuit means some sort of chase, . . . it need not be an extended hue and cry in and about the public streets." *Id.* (internal quotation marks omitted). In the case before it, "[t]he fact that the pursuit . . . ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into Santana's house." *Id.* at 43.

Four years later, the Court stated in *Payton v. New York*, 445 U.S. 573, 589-90 (1980), that, "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion," a proposition heavily relied upon by Holloran Sr. After an investigation, police had assembled evidence that Payton had murdered a gas station manager. *Payton*, 445 U.S. at 576. Officers went to his apartment to make the arrest, received no response at the door, and used crowbars to break the door and enter the residence. *Id.* The Court held that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603. Absent an arrest warrant, the warrantless entry was unconstitutional. *Id.* *Payton*, however, is not on point, as it involved a routine arrest and did not include an analysis of any form of exigent circumstances. *See id.* at 583 ("Although it is arguable that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances, none of the New York courts relied on any such justification. The Court of Appeals majority treated . . . Payton's . . . case[] as involving [a] routine arrest[] in which there was ample time to obtain a warrant and we will do the same. Accordingly, we have no occasion to consider . . . exigent circumstances[.]").

21

In 1984, in *Welsh v. Wisconsin*, 466 U.S. 740 (1984), the Court addressed the question of whether a warrantless entry on exigent circumstances grounds could be constitutional in the case of a misdemeanant. *Welsh*, 466 U.S. at 750. The Court opined that "[w]hen the government's interest is only to arrest for a minor offense, [the] presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." *Id.* (internal footnote omitted). Accordingly, the Court concluded that

> an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made. Moreover, although no exigency is created simply because there is probable cause to believe that a serious crime has been committed, . . . application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed.

*Id.* at 753. In *Welsh*, the plaintiff ran his car off the road and walked the short distance to his home. *Id.* at 742. Police officers responded to a call from another motorist and, upon finding out where the man lived, proceeded to his house. *Id.* at 743. They entered the dwelling, found the plaintiff lying naked in bed, and arrested him for driving under the influence. *Id.* In making its determination, the Court noted that there was no pursuit and, because Welsh had already arrived at home and abandoned his vehicle at the scene of the accident, there was little remaining threat to public safety. *Id.* at 753.

In 2013, the Court revisited *Welsh* on a qualified immunity claim. *Stanton v. Sims*, 134 S. Ct. 3 (2013) (per curiam). In *Sims*, police responded to a call concerning an unknown disturbance involving a baseball bat. *Id.* at 3. When they arrived, the officers saw three men walking in the street. *Id.* One hurried toward a nearby house. *Id.* The man did not have a bat but one of the

officers, Stanton, thought he was acting suspiciously and decided to detain him to investigate the matter further. *Id.* at 4. Despite Stanton's calls for him to stop, the man quickly walked through a gate that enclosed Sims's front yard. *Id.* Stanton, believing the man had committed a misdemeanor by disobeying his order to stop, kicked open the gate and took the man into custody. *Id.* The Court recognized that its previous decision in *Welsh* did not "lay down a categorical rule for all cases involving minor offenses, saying only that a warrant is 'usually' required." *Id.* at 6; *see also Greiner*, 27 F.3d at 1354 ("Courts have differed in their views of how much uncharted territory *Welsh* leaves open."). Since the unconstitutionality of Stanton's action was not "beyond debate" based on the equivocal nature of *Welsh,* the *Sims* Court found he was entitled to qualified immunity. *Sims*, 134 S. Ct. at 7. Thus, even a year after the events of this case occurred, the Supreme Court could not say *Welsh* completely foreclosed the possibility that entry into a house to arrest a misdemeanant could be constitutional.

Granted, these cases focused on the hot pursuit exception while, in the charge conference, Defendants contended that the prevention of escape by a fleeing suspect exception was primarily in play here.[6] The parties have presented no caselaw specifically delineating the parameters of this exception and the Court has located none on its own.[7] The Defendants have drawn the Court's attention, however, to *United States v. Ortega*, No. 8:11CR194, 2011 WL 6190155 (D. Neb. Oct. 28, 2011), *report & recommendation adopted* 2011 WL 6026698 (D. Neb. Dec. 5, 2011), which offers some guidance on the issue. In that case, the court cited to the Eighth Circuit's determination

---

[6]Indeed, the Court held, prior to giving the case to the jury and at the request of counsel for purposes of appeal, that the hot pursuit exception did not apply as a matter of law. It has been resurrected in the Defendants' response to the instant motion.

[7]The reason for this dearth of precedent may simply be that, unlike "hot pursuit," prevention of escape by a suspect is fairly self-explanatory.

in *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010), for the proposition that exigent circumstances justify warrantless entry where the suspect's escape is imminent. *Ortega*, 2011 WL 6190155, at *5. The district court explained that "[t]he determination of whether a suspect's escape is imminent necessarily includes an assessment of the risk that the suspect may escape from the residence undetected." *Id.* (citing *United States v. Oung*, 490 F. Supp. 2d 21, 30 (D. Mass. 2007)) (internal emphasis & quotation marks omitted). Further, "where an escape is threatened the totality of the circumstances incorporate the suspect's potential for a successful escape from inside the residence." *Id.* In *Ortega*, the court concluded there was no objectively reasonable basis for the officers to believe a suspect's escape was imminent. *Id.* at *6. While the suspects were in an apartment and attempted to push the screen out of a window, they were on the third floor of the building, which was surrounded by more than a dozen officers who could see them. *Id.*

The court's analysis in *Ortega* aligns with the Sixth Circuit's conclusion in *O'Brien v. City of Grand Rapids*, 23 F.3d 990 (6th Cir. 1994). Although argued as a hot pursuit case,[8] the *O'Brien* court noted, in finding no exigency existed, that the plaintiff, who had barricaded himself in his home, could not flee unnoticed from the house because it was surrounded by officers and the area was secured. *O'Brien*, 23 F.3d at 997-98.

According to the Defendants' proof, Holloran Sr. was, at the least, suspected of contributing to the delinquency of minors before he crossed his threshold. There was also testimony, which the jury could reasonably have believed, that he was under arrest or about to be arrested at that time. The jurors further appear to have credited the officers' testimony that he slammed and locked the

---

[8]The defendant officers did not argue and, thus, the court was not called upon to determine, whether the prevention of escape by a suspect exigency applied. *O'Brien*, 23 F.3d at 997.

door in an attempt to thwart that arrest and/or to escape. Earlier in the evening, Holloran Sr. saw the officers enter his property and took off into the woods with such urgency that he cut himself climbing through brambles. On his return to the farmhouse some three hours later, he lied to the officers about where he had been. According to Holloran Sr. himself, he returned to check on his home. There was no proof presented that he did so to turn himself in or that he even knew the police were still there. By that time, according to the officers, they had decided to turn off their flashlights, pull the cruisers back and wait for those still hiding from them in the woods to come out on their own. Further, the residence, which had multiple entrances, was not surrounded at any time. Nor was there evidence that the area was secured except at the front gate. The jury could have reasonably concluded that the Defendants believed the homeowner could, and likely would, attempt to escape again to the far reaches of his property for a second time to keep from being arrested.

Viewing the evidence presented at trial in the light most favorable to the deputies, even if they were mistaken about the constitutionality of their second entry, the unconstitutionality of their action was not clearly established, whether as to the hot pursuit or prevention of a suspect's escape exigencies, at the time it occurred. *See Brenay v. Schartow*, Case No. 15-cv-13213, 2016 WL 7385713, *1-4 (E.D. Mich. Dec. 21, 2016) (where plaintiff opened front door to officers and, upon discovering he was to be arrested, tried to close it in an apparent attempt to evade arrest, officer's action in reaching across threshold to grab his wrist was not, based on *Santana*, in violation of clearly established law), *appeal filed* (No. 17-1009) (6th Cir. Jan. 6, 2017). Consequently, the deputies are entitled to qualified immunity. The motion for judgment as a matter of law based on the second entry into the Holloran home is denied.

### D.  Exclusion of Evidence Concerning *Miranda* Warnings

At trial, counsel for Plaintiffs sought to elicit testimony from Defendants regarding whether *Miranda* warnings were given to party attendees.  The Court did not disagree that the officers perhaps should have given the warnings, but sustained the Defendants' objection on relevance grounds, as no violation of *Miranda v. Arizona*, 396 U.S. 868 (1969), had been pleaded.  It also opined that whether *Miranda* warnings were given did not relate to the reasonableness of the Defendants' actions in determining that probable cause existed to arrest the Plaintiffs, which was the question before the Court.  The movants argue the Court misconstrued their reasons for seeking this evidence, stating that they were attempting to impeach the Defendants' evidentiary basis for probable cause to arrest.  By sustaining the objection, they posit, the Court permitted Defendants to contend that probable cause was established through actions possibly taken in violation of *Miranda* while denying them the opportunity to impeach that testimony, as any reasonable officer would have been aware the warnings were warranted prior to obtaining incriminating statements.

Plaintiffs offer no caselaw to support their request for a new trial on this ground.  Nor have they averred or shown prejudice resulting from the Court's ruling.  Here, the Plaintiffs have failed to convince the Court the alleged error warrants a new trial.  The request for relief based on Plaintiffs' assertion that the exclusion of this evidence was erroneous is denied.

### E.  Exclusion of Testimony of Kenneth Christopher

It is undisputed that King's flashlight connected with Holloran Jr.'s head in some manner after he was handcuffed.  Holloran Jr. and Plaintiff John Rainey testified that the sheriff hit the former with the flashlight.  The sheriff stated at trial that he had no reason to strike the boy intentionally, adding, "When I put him to the ground or he went to the ground pretty willingly.  I had my flashlight in my hand.  If he inadvertently got touched with a flashlight, I don't know.  But

he was pretty cooperative at that point." (D.E. 244 at PageID 4319.) Deputy Duncan testified that, when King ordered Holloran Jr. to the ground, he placed his hand on the young man's shoulder. According to Duncan, "[i]t wasn't a throw or push or even much of anything other than a touch." (D.E. 243 at PageID 4071.) At the time, King had his flashlight in his hand and, Duncan recalled, when Holloran Jr. turned his head, the flashlight tapped against the side or back of his head. In the officer's opinion, the contact could have been incidental. Evan Brown, a party attendee and co-Plaintiff, testified that he saw the sheriff had a flashlight in his hand and that it was near Holloran Jr.'s head but did not see him strike the boy.

Christopher was a Benton County deputy at the time of the arrests at the Holloran farm and had been elected sheriff of Benton County at the time of trial. In his deposition, Christopher testified that King, while he was sheriff, sprayed a jail inmate with mace and struck or pushed a handcuffed inmate's head with his hand. At trial, King stated that it was not appropriate to strike a handcuffed suspect and that he had never done so.

Plaintiffs' counsel proffered Christopher as a witness to show the strike was intentional, to impeach the sheriff's testimony that he had never hit a suspect, and to demonstrate that his actions constituted a County custom or policy of excessive force. The Court sustained Defendants' objection to presentation of testimony concerning the prior jail incidents on relevance grounds. Plaintiffs restate their objection to the exclusion herein.

In Christopher's deposition taken May 16, 2014,[9] the following testimony was adduced:

Q:     Have you ever seen [Sheriff King] strike anybody?

A:     Yes, sir, I -- I have.

---

[9]At the time of his deposition, Christopher was running as a candidate for the sheriff's position against King.

Q:  Okay.  Now, I have information that -- you know, I mean, we -- were you aware, did you see him, Tony King, about three and a half years ago handcuff three detain -- detainees at the Benton County Jail, place them on their knees, facing them and flashlight-whip them?

A:  No, sir.  I did not see him hit anyone with a flashlight.

Q:  What'd he hit them with?

A:  He -- and -- and -- I'm remembering this the best I can, he either hit them in the back of the head with his hand while he was facing the wall, or he pushed his face against the wall.  And I don't remember which it was.

Q:  But it caused them injuries, correct?  They were handcuffed?

A:  Yes, sir.

Q:  Okay.  And this happened before the Holloran incident, correct?

A:  Yes, sir. . . .

                    *          *          *

Q:  Yeah, just tell it -- tell the -- tell the story from beginning to end.

A:  I got a call to go to the jail, that they had three inmates that had been acting up.  They was kicking the doors and this and that.  And that Sheriff King was there and then he wanted one of the deputies to come there to do a transport.  Because at the time, whenever we had any inmates that was acting up, they would transport them to Montgomery County for housing. I don't know what departments was that, but that's what -- that was their policy.

And when I got there, Sheriff King was standing back at the door in the cell, where the inmates was that was creating the problem.  I didn't hear any commotion going on in the jail, but he had the jailers come back there and stand by the door.

I went back there and he said, I want you to go in there and get this inmate and this inmate and this mate [sic], and I -- I don't remember their names.  I don't know who it was.  I had everybody sit on their bunks and went back there and got them one at a time.  And he said handcuff them, and we'll transport.  They're going to Montgomery County.

He was upset with them. Brought them outside. The jailers was standing there. I think one of the jailers went in with me to get them. I brought them back outside the cell. He closed the cell door and they begin to argue.

And when him and two of the three were brought out, just exchanging words and some cussing. And the guy told him that, you know, something that he didn't like, I -- something about some guns. You know that I know something about some guns.

Q:      The inmate said that to Sheriff King?

A:      Yes, sir. And it got a little more heated, and he said, don't you stand there and look at me. He said, get on your knees when you're talking to me. And there -- the jailers then told, you know, do what he says.

And I told him, I said, just do what he's telling you to do. I didn't -- I thought at the time that usually the procedure with having them get on their knees in a chair in order to put shackles on. And then when we transport, we always put shackles on, so that they don't run. I thought that's what we was doing.

And after that happened, he got closer to them, and the guy that was closest to him was the one doing most of the arguing, and he said, you can do whatever you want. I remembering this the best I can. You can do whatever you want. You're still a crook. And --

Q:      The inmate said that to the sheriff?

A:      Yes, sir. And the sheriff was mad, and he was -- he was cussing him. And he said, don't look at me. Put your faces to the wall. You don't look at me. He -- they crawled on their knees, I'm going to guess, four or five feet, over to the wall. And was on their knees.

He told them to cross their legs, and they crossed their legs and he started talking to them again, and there was some more yelling and cussing going on. He told the one inmate that he was going to spray him if he didn't shut up.

And he cussed the sheriff, and the sheriff sprayed him with some mace. And when he got done, the guy said something else to the effect of, you can spray me if you want to, but you're still a crook.

> And the sheriff took his hand and either pushed his face into the wall or slapped him in the back of the head. I don't know which. I just seen his head pop the wall.

(D.E. 114-4 at PageID 1606-07.)

Under Rule 404(b) of the Federal Rules of Evidence, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence may be admissible for other purposes, however, including "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The rule has been described as one of "inclusion rather than exclusion." *United States v. LaVictor*, 848 F.3d 428, 446 (6th Cir. 2017). The evidentiary rules further instruct that courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time . . ." Fed. R. Evid. 403. Relevant evidence is that having "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401.

Before Rule 404(b) evidence may be introduced, the court "must assure itself that the other act did, in fact, occur[.]" *United States v. Cureton*, 661 F. App'x 369, 375 (6th Cir. 2016). In addition, character evidence proffered to show intent must relate to conduct that is "substantially similar" to the action taken in accordance with bad character. *United States v. Williams*, 662 F. App'x 366, 375 (6th Cir. 2016).

The alleged prior incident was inadmissible. Christopher's vague testimony had little relevance to the issues before this Court. He did not testify in his deposition, or would presumably

testify at trial, that King had ever struck anyone with a flashlight or other object prior to the Holloran incident. With respect to the previous occurrence at the jail, Christopher stated that he saw the inmate's head "pop" the wall, but it is not entirely clear whether he actually observed the sheriff strike him or just assumed so from the movement of the inmate's head. Any tendency of this somewhat speculative proof to make the fact that King intentionally struck Holloran Jr. with a flashlight in the summer of 2012 more probable than it would have been without the evidence would be a bit of a stretch, and was outweighed by the prejudicial impact and likelihood that the jury would decide the case on an impermissible ground -- namely, a conclusion that Sheriff King was a hothead and sometimes acted with physical violence in accordance with that trait. *See Watkins v. Cty. of Genesee*, Case No. 13-13678, 2016 WL 727855, at *3 (E.D. Mich. Feb. 24, 2016) (even if evidence concerning an officer defendant's prior beating of a "Mr. Holmes" was probative to the plaintiff's excessive force claim, the danger that the jury would give undue weight to the evidence was outweighed by the danger of undue prejudice and confusion); *Brown v. Weber*, No. 1:11-cv-01390-JDB-egb, 2014 WL 11531797, at *1 (W.D. Tenn. July 11, 2014) (court found relevancy of evidence that defendant officer previously used a TASER a number of times to issue of whether he used excessive force on the plaintiff was suspect and unduly prejudicial, noting "[t]he most obvious insinuation of Brown presenting proof regarding Defendant's numerous other uses of his TASER is that he uses it cavalierly and/or excessively and did so on the date in question. To allow the evidence for that purpose would be to ignore the proscription of Rule 404(b)[].").

Also bothersome to the Court is the fact that there is no evidence of a finding of misconduct arising from the incident Christopher described by any court or tribunal. Thus, asking the jury to make a decision concerning the alleged conduct would have required a trial within a trial, causing confusion of the issues, wasted time and undue delay. *See Watkins*, 2016 WL 727855, at *3

(proposed evidence of the beating of "Mr. Holmes" inadmissible under Rule 404(b) because there was "no evidence that a finding of misconduct was made by a court or tribunal" and, accordingly, jury would be required to engage in mini-trials resulting in confusion and undue delay); *Howerton ex rel. Howerton v. Blomquist*, 240 F.R.D. 378, 381 (E.D. Mich. 2007) (evidence of previous assault offered to show defendant's pattern of behavior, where defendant denied the allegation, held inadmissible as court was unconvinced a jury could reasonably find the prior act in fact occurred and determination would necessitate a trial within a trial). The trial in this case was lengthy and one of the most contentious ever tried before this Court. There was substantial reason for concern that any mini-trial necessary to determine precisely what occurred at the jail in 2011 would have led to confusion of the issues and undue delay that would outweigh any probative value of the proffered evidence.

The motion for new trial for failure to admit this witness's testimony is denied.

### F. Denial of Plaintiffs' Requests for Jury Instructions

The Plaintiffs devote a single paragraph in their motion for new trial to their assertion that the Court erred with respect to the jury instructions, arguing their requested instructions were correct statements of the law and supported by the evidence presented at trial. In a footnote, they refer to charge conference transcripts in which instructions concerning the use of force during Holloran Sr.'s arrest, his right to resist arrest and the destruction of a videotape of the jail premises on the night of the arrests were discussed.

Jury instructions should "adequately inform[] the jury of the relevant considerations and provide[] a basis in law for aiding the jury in reaching its decision." *United States v. Lively*, ___ F.3d ___, 2017 WL 1130185, at *12 (6th Cir. Mar. 27, 2017). A verdict should not be set aside based on incorrect jury instructions unless, viewed as a whole, they are "confusing, misleading, and

prejudicial." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) (citing *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 641 (6th Cir. 2005)). If the jury would not have been so misled or confused by an erroneous instruction that a different outcome would have occurred at trial, no reversal should be made. *Pivnick v. White, Getgey & Meyer Co., LPA,* 552 F.3d 479, 488 (6th Cir. 2009). "An erroneous jury instruction should not be reversed where the error is harmless." *E.E.O.C. v. New Breed Logistics,* 783 F.3d 1057, 1074-75 (6th Cir.), *reh'g en banc denied* (July 8, 2015). With these principles in mind, the Court will address the Plaintiffs' specific challenges in turn.

### 1. Holloran Sr.'s Right to Resist Arrest

Although the Plaintiffs do not identify the proposed instruction which is the subject of this challenge, the Court assumes they are referring to that contained in D.E. 227 entitled "Right to Resist Unlawful Arrest." The proposed instruction stated as follows:

> The right to resist an unlawful arrest was well established at common law. "If the officer have no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest." *John Bad Elk v. United States*, 177 U.S. 529, 535, 20 S. Ct. 729, 731, 44 L. Ed. 874 (1900). "One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases." *United States v. [DiRe]*, 332 U.S. 581, 594, 68 S. Ct. 222, 228, 92 L. Ed. 210 (1948).

(D.E. 227 at PageID 3840.)

The Sixth Circuit recognized in *United States v. Halliburton*, No. 91-6268, 1992 WL 138433, at *5 (6th Cir. June 19, 1992) (per curiam), that "[t]he principle enunciated in the *John Bad Elk* case remains valid but is much criticized." Other cases have likewise looked askance at the 117-year-old decision. In *Von Kahl v. United States*, 242 F.3d 783 (8th Cir. 2001), the Eighth Circuit articulated as follows:

> At common law, a person was permitted to forcibly resist an unlawful arrest, and third parties were permitted to aid such resistance[, citing *John Bad Elk*]. However, in *Hodgdon v. United States*, we indicated -- albeit in dicta -- that the common law rule was no longer good law: "No person should be entitled to resist with deadly force a marshal operating under color of authority, even though it is later found that no actual authority existed. Adequate legal protection exists against unlawful searches and arrests." 365 F.2d 679, 685 (8th Cir. 1966). This statement is consistent with the widespread criticism of the rule and the trend toward its abrogation.

*Von Kahl*, 242 F.3d at 790 (internal alterations, parentheticals & some citations omitted); *see also United States v. Ferrone*, 438 F.2d 381, 390 n.21 (3d Cir. 1971) (noting that several courts had "conclude[d] that there is no longer a right to resist an unlawful arrest," citing cases, "all of which questioned the continuing vitality of" *John Bad Elk* and *Di Re*; court further observed that the Uniform Arrest Act and the Model Penal Code had also eliminated the right to resist an illegal arrest); *United States v. Simon*, 409 F.2d 474, 477 (7th Cir. 1969) ("We recognize that law enforcement officers are frequently called on to make arrests without warrants and should not be held, so far as their personal security is concerned, to a nicety of distinctions between probable cause and lack of probable cause in differing situations of warrantless arrests[;] . . . [i]t is for this reason we believe that the force of *John Bad Elk* has been diminished."); *United States v. Heliczer*, 373 F.2d 241, 246 n.3 (2d Cir. 1967) ("In recent years the right to resist an illegal arrest has been severely criticized and rejected by many persuasive authorities. . . . There is, therefore, a present trend toward holding that the legality of an arrest -- which is often a close question -- should be decided by a court of law without the preliminary trial by battle in the streets. As Judge L. Hand said, 'The idea that you may resist peaceful arrest . . . because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine, . . . (is) not a blow to liberty but, on the contrary, a blow for attempted anarchy.").

Tennessee, like many other states, has passed legislation superseding the common law holding of *John Bad Elk*.   Tennessee Code Annotated § 39-16-602 provides in pertinent part that

    (a)    [i]t is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

    (b)    . . . [I]t is no defense to prosecution under this section that the stop, frisk, halt, arrest or search was unlawful.

Tenn. Code Ann. § 39-16-602(a)-(b).   The statute's commentary states that "[s]ubsection (b) makes it clear that the offender cannot defend by proving that the law enforcement activity was unlawful.   This rejects traditional authority, but is consistent with the modern trend.   Unlawful law enforcement activities should be remedied in court."   Tenn. Code Ann. § 39-16-602 comments of the Tenn. Sentencing Comm'n. (internal citation omitted).

During the charge conference, the Court took note of the erosion of the *John Bad Elk* proposition and the existence of the Tennessee statute.   The Court also drew the parties' attention to *Villafranca v. United States*, Civil Action No. 3:06-CV-0806-N, 2008 WL 8919855 (N.D. Tex. Aug. 19, 2008), *aff'd* 587 F.3d 257 (5th Cir. 2009), in which the district court, finding the plaintiff had committed the crime of resisting arrest under a Texas statute virtually identical to § 39-16-602, stated that "[a]lthough Villafranca cites two old Supreme Court cases making passing reference to some type of right to resist an unlawful arrest," referring to *John Bad Elk* and *Di Re*, "it is now clearly established under Texas law that it is no defense to resisting arrest . . . that the arrest . . . was unlawful."   *Villafranca*, 2008 WL 8919855, at *2 n.3 (internal alterations, citations & quotation marks omitted).

Plaintiffs' attorneys could not at that time, and have not now, offered any cases except for *John Bad Elk* and *Di Re* in support of the proposed jury instruction. Counsel has failed to convince the Court its rejection of the proposed instruction was incorrect, much less that it rendered the instructions as a whole confusing, misleading, and prejudicial. The motion on this ground is denied.

### 2. Use of Force in Holloran Sr.'s Arrest

While, again, the Plaintiffs did not identify the proposed jury instruction at issue, the Court assumes it refers to the following:

> If no probable cause authorizes an arrest, any use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment. This rule makes sense because if a stop or arrest is illegal, "then there is no basis for any threat or any use of force, and an excessive force claim would always arise but only collaterally from the illegal stop or arrest claim." Plaintiffs' damages for unlawful arrest, therefore, include damages for any injury, pain and suffering, and mental anguish caused by the force used to effect that false arrest, regardless of whether the force would have been reasonable or excessive had there been probable cause.

(D.E. 193 at PageID 3506.)

At the charge conference, Plaintiffs' counsel argued that, if officers are illegally in a house, they are prohibited from using any force at all, citing the Eleventh Circuit's determination in *Bashir v. Rockdale County, Georgia*, 445 F.3d 1323, 1331-33 (11th Cir. 2006). Plaintiffs' attorney, Mr. Clarke, stated:

> This is the actual language at Page 1332 [in *Bashir*]. Walters alleges that Freeman violated his Fourth Amendment rights by using excessive force during the encounter. Because of the facts used in the light most favorable to Walters it demonstrate [sic] that Freeman's entry into apartment [sic] was unlawful. We must also conclude that they support a finding of constitutional excessive force violation. As we have stated, if an arresting officer does not have the right to make the arrest he doesn't have the right to use any degree of force in making the arrest.

(D.E. 251 at PageID 6205.)

First, while *Bashir* does contain a page numbered 1332, that page does not include the language read by Mr. Clarke in the charge conference. The quoted passage is actually from *Walters v. Freeman*, 572 F. App'x 723, 729 (11th Cir. 2014) (per curiam), a case not cited to the Court by the Plaintiffs during the discussion, although the last sentence of the excerpt referenced *Bashir*. Secondly, the Court finds no benefit to Holloran Sr. in *Bashir* itself. The portion of the opinion relied upon by Mr. Clarke consisted of the following:

> . . . [Plaintiff] argues Davis applied "excessive force" because any force used in an illegal arrest is necessarily excessive.
>
> Under this Circuit's law, a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim. The right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. It follows, then, if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest. This is the premise of Bashir's "excessive force" claim; but this is not what is meant by "excessive force." An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest. When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest. A claim like Bashir's -- that the deputies used excessive force in the arrest because they lacked the right to make the arrest -- is not a discrete constitutional violation; it is dependent upon and inseparable from his unlawful arrest claim. We reiterate, where an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim. Bashir does not present a discrete excessive force claim and, therefore, his excessive force claim fails as a matter of law.
>
> This is not to say that Bashir cannot recover damages for the force used in his arrest. To the contrary, the damages recoverable on an unlawful arrest claim include damages suffered because of the use of force in effecting the arrest. But, to permit a jury to award damages on Bashir's excessive force and unlawful arrest claims individually would allow him to receive double the award for essentially the same claims.

*Bashir*, 445 F.3d at 1331-32 (internal citations & quotation marks omitted).   Clearly, *Bashir* dealt

with an unlawful arrest claim, which does not exist here.   In this case, Holloran Sr. acknowledged

at trial that officers had probable cause to arrest him.   Under that circumstance, the case cited by

the Plaintiffs would have permitted the use of some degree of force.   *See id.*   The motion based

on the proposed jury instruction is denied.

### 3.   The Spoliation of Evidence Instruction

The Court gave the following instruction concerning the spoliation of evidence:

> You have heard testimony about video footage that was not produced.   The
> Plaintiffs have argued that this evidence may have shown something important
> about this case.

> This Court has found, and you must accept as true, that the Plaintiffs requested
> Defendants Benton County and Sheriff Tony King to preserve video footage from
> the jail on the night of the alleged incidents.   That footage existed at the time it was
> requested, but was erased or overwritten by Sheriff King or permitted by him to be
> erased or overwritten.

> From the Court's findings, you are allowed to infer, or conclude, that the lost
> footage would have shown something favorable to the Plaintiffs and unfavorable to
> Benton County and Sheriff King with respect to the Sheriff's conduct in the jail and
> jail parking area.

> I am not telling you that you have to reach that conclusion, only that you can if you
> think it reasonable.   Whether or not you do so is solely a matter within your
> collective discretion based on your consideration of this instruction and all of the
> other evidence in the case.

> This instruction does not apply to events that occurred at the Holloran farm or
> during the transportation of the Plaintiffs to the Benton County jail, except as to the
> parking lots which would have been under the scrutiny of the cameras.   Further,
> this instruction applies only to Benton County and Sheriff King.   You are
> instructed not to consider this inference against any of the Defendant Deputies at
> any time or place.

(D.E. 232 at PageID 3887.)

On August 1, 2014, the Plaintiffs moved for sanctions against the Defendants for spoliation of evidence in reference to the videotapes. (D.E. 97.) The motion was referred to the magistrate judge, who, in a report and recommendation entered October 6, 2014, recommended that a mandatory adverse inference instruction be given to the jury at trial. (D.E. 110.) In an order entered November 20, 2014, this Court adopted the determination of the magistrate judge that an adverse inference instruction was appropriate, but modified the proposed instruction in favor of a permissive instruction that could be further modified at trial to conform to the evidence presented. (D.E. 138.) Subsequently, on March 18, 2015, the Court granted summary judgment in favor of the Defendants with respect to Plaintiffs' Fourteenth Amendment claims of deliberate indifference to their serious medical needs, health and safety during their detention at the County jail. (D.E. 154.) Thus, at the time of trial, the only purpose for the instruction related to the amount of damages to be awarded to the Plaintiffs.

At the charge conference, it was the Defendants who objected to certain language in the instruction. Mr. Clarke offered the following in response: "I like the language that's in there. You now, it's [a] spoliation instruction. We asked for a stronger one." (D.E. 251 at PageID 6185.) Plaintiffs make no assertion in the motion at bar that the permissive instruction was confusing, misleading or prejudicial. Nor do they explain how it was not a correct statement of the law. To the extent Plaintiffs are simply challenging the Court's November 20, 2014, ruling against the mandatory instruction, their argument is more properly directed to the Sixth Circuit in the form of an appeal.

### G.  Denial of Plaintiffs' Objections to Jury Verdict Form

The jury verdict form used at trial consisted of thirty pages.   The first page of the form read as follows:

### <u>General</u>

1.   Do you find, by a preponderance of the evidence, that any of the Plaintiffs were arrested without probable cause?

Yes:  ____          No:  ____

*Proceed to the next question.*

2.   Do you find, by a preponderance of the evidence, that Dan Holloran, Sr., Dan Holloran, Jr., **or** Aaron Roden were subjected to excessive force?

Yes:  ____          No:  ____

*Proceed to the next question.*

3.   Do you find, by a preponderance of the evidence, that Plaintiff Dan Holloran, Sr. was subjected to an unlawful entry of his dwelling?

Yes:  ____          No:  ____

(D.E. 231 at PageID 3843.)   On the second page, jurors were instructed that, if they answered any of these questions in the affirmative, they were to proceed to those portions of the verdict form dealing with those questions.   The remainder of the form was divided into separate parts for each claim and each Plaintiff.

The original form proposed by the Defendants contained four introductory questions. During the charge conference, the Plaintiffs objected to a general question that asked whether any of their constitutional rights were violated.   The Court sustained the objection and removed the question, leaving the three inquiries set out above.

It is the position of the movants that these questions were improper, as their claims were to be analyzed based on individualized probable cause, not as a group. However, after giving negative responses to each of the questions on the first page, the jury foreman, even though not required to do so, painstakingly continued through the entire form, marking "no" in each part, as to each *individual claim and Plaintiff*, as a reflection of the jury's determination that no Plaintiff suffered constitutional harm.

The Court finds no prejudice here. It is clear the jury considered probable cause as to each individual Plaintiff and claim. There is no evidence whatever that the jury was so misled or confused by the form that a different outcome would have occurred had the three introductory questions been excluded. *See Pivnick, supra.* The motion on this ground is denied.

## H. Verdict Against the Weight of the Evidence

This challenge focuses on the Plaintiffs' false arrest claims, which by the time the case went to the jury were leveled only at Defendant King. Specifically, they assert that (1) the sheriff did not have sufficient time to establish probable cause as to all of the Plaintiffs before ordering that a school bus be driven to the property in order to transport a large number of people to jail; (2) the jail's booking policy was not followed; (3) the Plaintiffs who were under the age of twenty-one at the time of the incident, except for Holloran Jr., testified they were not drinking; (4) the Plaintiffs over the age of twenty-one testified they did not provide alcohol to minors; (5) the deputies agreed that issuing citations based on individual probable cause findings was appropriate but were overridden by King's order to arrest everyone; (6) the deputies' testimony showed they lacked individualized probable cause to arrest all of the Plaintiffs; (7), after deputies expressed concerns about the charges to be placed on warrants for Plaintiffs' arrests, the sheriff told them to "work it out

amongst themselves," resulting in charges against only forty-six individuals; and (8) King could not identify particularized facts supporting probable cause as to each Plaintiff.[10]

"The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145 (1979). In order for liability to be imposed on the basis of an unlawful arrest in violation of the Fourth Amendment, a plaintiff must demonstrate that the police lacked probable cause. *Harmon v. Hamilton Cty.*, ___ F. App'x ___, 2017 WL 76963, at *9 (Jan. 9, 2017). As the Sixth Circuit recently articulated:

> The test for probable cause is not reducible to precise definition or quantification. Probable cause is a practical and common-sensical standard based on the totality of the circumstances. Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person in believing that the suspect committed, is committing, or is about to commit an offense.

*Smith v. City of Wyoming*, 821 F.3d 697, 714-15 (6th Cir.) (internal alterations, citations & quotation marks omitted), *reh'g en banc denied* (June 30, 2016). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed a crime." *Harmon*, 2017 WL 76963, at *9. "[A] police officer has no duty to search for exculpatory facts if the facts within the officer's knowledge establish probable cause." *Dodd v. Simmons*, 655 F. App'x 322, 327 (6th Cir. 2016). "In fact, law enforcement is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the

---

[10]Plaintiff Roden was arrested for resisting arrest. It does not appear the Plaintiffs are challenging the jury's finding that this arrest was constitutional.

facts as initially discovered provide probable cause." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) (alteration & internal quotation marks omitted).

Tennessee Code Annotated § 1-3-113 makes it "unlawful for any person under twenty-one (21) years of age to . . . possess, transport or consume alcoholic beverages, wine, or beer[.]" Tenn. Code Ann. § 1-3-113(b). State statute also prohibits "any person under the age of twenty-one (21) years to have in such person's possession or to consume any intoxicating liquor or beer for any purpose[.]" Tenn. Code Ann. § 57-3-412(a)(3)(A). Tennessee law further provides that

> [a]ny adult who contributes to or encourages the delinquency or unruly behavior of a child, whether by aiding or abetting or encouraging the child in the commission of an act of delinquency or unruly conduct or by participating as a principal with the child in an act of delinquency, unruly conduct or by aiding the child in concealing an act of delinquency or unruly conduct following its commission,

commits a misdemeanor. Tenn. Code Ann. § 37-1-156(a). An adult is defined under state law as "any person eighteen (18) years of age or older." Tenn. Code Ann. § 37-1-102(b)(3). "Contributing to the delinquency of a minor may be committed in an unlimited variety of ways which tend to produce or encourage or to continue conduct with a child which would amount to delinquent conduct." *Butturini v. Blakney*, No. 3:08-CV-128, 2012 WL 775293, at *6 (E.D. Tenn. Mar. 7, 2012) (quoting *Birdsell v. State*, 330 S.W.2d 1, 5 (Tenn. 1959)) (internal quotation marks omitted).

The Plaintiffs under the age of twenty-one who claimed unlawful arrest included Ricke, Brown, Harris, Scott, Hallman and Rainey. They testified at trial they were not drinking, although the deputies' testimony contradicted at least some of those assertions. In any event, all of the Plaintiffs were over the age of eighteen and, therefore, were adults subject to arrest for contributing to the delinquency of minors. The fact that none of the Plaintiffs admitted to actually

providing alcohol to underage persons is irrelevant, as the language of the contributing statute does not limit its scope to the discrete act of handing an intoxicating beverage to a person under eighteen. Proof was presented at trial that there were drunk children under the age of eighteen at the party, as well as evidence of beer kegs, empty beer cans and whiskey bottles strewn about, and the aroma of alcohol in the air. The jury apparently believed this evidence, and concluded it was reasonable for King to believe all of the Plaintiffs had committed, were committing or were about to commit at least the misdemeanor crime of contributing to the delinquency of minors based on the law given to them.[11] The Court cannot say, viewing the evidence in the light most favorable to the sheriff, that the jury's finding of probable cause to arrest the Plaintiffs was a seriously erroneous and unreasonable one. The facts that booking procedures at the jail may not have been followed after the arrests were made, that some deputies might have handled the situation differently, that a bus was ordered or that not everyone arrested was ultimately charged did not render the probable cause finding at the time of the arrests unreasonable.

This case was a difficult one with many moving parts. The jury had to sift through the recollections of numerous parties concerning events that occurred four years earlier, weigh the credibility of those witnesses, and make its findings in accordance with the Court's instructions. The Plaintiffs were understandably disappointed with the result, "but a jury's choice [among] competing stories is the essence of the sacred fact-finding role entrusted to that body." *See*

---

[11]Plaintiffs did not, nor do they herein, object to the jury instruction on contributing to the delinquency of a minor under Tennessee law, which followed the wording of the statute and included the language from *Butturini* quoted in the preceding paragraph. While during the charge conference they objected to adding to a proposed instruction on the determination of probable cause the language "or is about to commit a crime," they offered no basis whatever for the objection, which was denied, and have not renewed their challenge in the instant motion. (*See* D.E. 251 at PageID 6195-96.)

*Martin v. Johnson*, No. 5:15-CV-234-REW, 2016 WL 6699138, at \*4 (E.D. Ky. Nov. 14, 2016).

The motion for a new trial based on the weight of the evidence is denied.

### I.   Dismissal of Unlawful Entry and Detention Claims

The final claim concerns rulings by the Court at the summary judgment stage.   A Rule 59 motion challenging a pretrial order on a motion for summary judgment constitutes a motion for reconsideration.   *Finn*, 768 F.3d at 448.   The local rules of this district permit a party to move for the revision of an interlocutory order on a specific showing by the movant of

> (1) a material difference in fact or law from that which was presented to the Court before entry of the interlocutory order for which revision is sought, and that in the exercise of reasonable diligence the party applying for the revision did not know such fact or law at the time of the interlocutory order; or (2) the occurrence of new material facts or a change of law occurring after the time of such order, or (3) a manifest failure by the Court to consider material facts or dispositive legal arguments that were presented to the Court before such interlocutory order.

LR 7.3(a)-(b).   Motions to reconsider interlocutory orders brought on other grounds are not permitted.   LR 7.3(a).   In the instant motion, the Plaintiffs argue none of the grounds enumerated in the local rule.   Instead, they merely incorporate by reference their briefs on the motions for summary judgment.   Reconsideration is an "extraordinary remedy" to be "granted sparingly" and should "not be used to re-litigate old matters."   *Rheinfrank v. Abbott Labs., Inc.*, 137 F. Supp. 3d 1035, 1038 (S.D. Ohio 2015), *aff'd* ___ F. App'x ___, 2017 WL 680349 (6th Cir. Feb. 21, 2017). "If the movant simply regurgitates arguments previously presented . . ., then the movant's proper recourse is an appeal to the circuit court."   *Id.*   The motion to reconsider issues decided on summary judgment is denied.

### V.   CONCLUSION

For the reasons set forth herein, the motion for judgment as a matter of law and for new trial is DENIED.   The Clerk is DIRECTED to reset this matter for a taxation of costs hearing.

IT IS SO ORDERED this 30th day of March 2017.

s/ J. DANIEL BREEN
SENIOR UNITED STATES DISTRICT JUDGE